[S. F. No. 10226. In Bank.—February 16, 1924.]

In the Matter of the Estate of DAVID JENNINGS BAIRD, Deceased. DAVID JENNINGS BAIRD, Respondent, v. VERONICA C. BAIRD et al., Appellants.

[1] LAW OF CASE—DEFINITION OF.—The rule of the law of the case is the rule requiring both trial and appellate courts to follow the rules laid down upon a former appeal whether such rules are right or wrong.

[2] ADOPTION—FORMER DECISION—LAW OF CASE.—Upon this appeal involving the question of adoption of an illegitimate child within the meaning of section 230 of the Civil Code, it is declared that the decision upon a former appeal (*Estate of Baird,* 182 Cal. 338) established as the law of the case that all the evidence adduced at the previous trial was insufficient as a matter of law to establish a legal adoption of the child.

[3] LAW OF CASE—RESORT TO PREVIOUS OPINION AND RECORD.—Upon the second appeal the court will not only look to the opinion of the court on the previous appeal, but also to the record for the

purpose of determining whether or not the law of the case should control in the determination of the second appeal.

[4] ID.—EVIDENCE.—On a second appeal the evidence may be different and yet unless it is substantially different in a material respect, the doctrine of the law of the case applies, and it applies notwithstanding the fact that in the previous decision evidence contained in the record is not quoted or cited in the opinion.

[5] APPEAL—QUESTIONS OF FACT.—The appellate courts in this state have no jurisdiction to pass upon questions of fact as distinguished from questions of law.

[6] ID.—EVIDENCE—ADOPTION—QUESTION OF LAW.—To determine on appeal that the evidence adduced at the trial on the question of adoption of an illegitimate child, with all the inferences properly deducible from such evidence, does not support the claim of adoption, is a determination of a question of law.

[7] ADOPTION—FORMER DECISION (ESTATE OF BAIRD, 182 CAL. 338)— LAW OF CASE—EFFECT OF.—The decision in *Estate of Baird*, 182 Cal. 338, to the effect that a case of adoption had not been established, was a decision upon a question of law and not of fact, and without regard to the correctness of the statement of the evidence or the legal principles declared therein said decision established the law of the case and was binding on a subsequent trial and appeal.

[8] ID.—CONCURRENCE OF JUSTICES IN FORMER DECISION — LAW OF CASE.—Where the concurrence of one of the justices of the supreme court in a department decision (*Estate of Baird*, 173 Cal. 617) was limited to the single ground that the trial court, in a proceeding involving the question of adoption of an illegitimate child, erred in refusing the child's demand for a jury trial, the decision on the question of such refusal alone constituted the law of the case, since the concurrence of three justices is necessary for a department decision.

[9] ID.—EVIDENCE—STATEMENTS BY FATHER—INCOMPETENCY OF.—In a proceeding involving the question of adoption of an illegitimate child within the meaning of section 230 of the Civil Code, the statement of the deceased father of such child in a conversation with a masseuse that his (the father's) mother knew about the child and that he himself had told her about it but that his mother had never seen it was an admission of his paternity and of his attitude toward the child, propositions as to which a great deal of evidence was introduced in the former trials; it was, however, not competent evidence that the decedent told his mother of the existence of the child.

[10] LAW OF CASE—CHANGE IN EVIDENCE—TEST.—The legal test by which it is to be determined whether a change in the evidence is sufficient to avoid the rule of the law of the case is that the

new evidence must be "materially," "essentially," or "substantially" different before it can be held the doctrine does not apply, and the rule is binding as to questions which involve and are controlled by the same principles.

[11] ID. — CUMULATIVE EVIDENCE — EFFECT OF. — Additional evidence merely cumulative to evidence of the same class given on the first appeal will not carry a question outside the operation of the rule as to the law of the case, but to successfully escape the rule a new and substantive fact must be brought into the case on the subsequent appeal.

[12] ADOPTION — ILLEGITIMATE CHILD — ADDITIONAL EVIDENCE — CONSTRUCTION OF.—On this appeal involving the question of adoption of an illegitimate child within the meaning of section 230 of the Civil Code, none of the additional evidence given on the third trial is essentially different from that received on the second trial; it does not present any new substantive fact, it involves no new principle, and where it supplements the former evidence it comes under the cumulative rule.

[13] ID.—ACKNOWLEDGMENT OF PATERNITY—EVIDENCE.—On such appeal, the claim that because of the hostility of the family of the alleged father of the illegitimate child toward the mother of the child and toward the child itself, the alleged father did not acknowledge his paternity nor introduce the child to his relatives cannot be sustained.

[14] ID.—RETRIAL AFTER DECISION ON APPEAL—CLANDESTINE CHARACTER OF FAMILY—CONCEALMENT—INSTRUCTIONS.—On a retrial of the issue of adoption by an unmarried father of an illegitimate child, after decision on appeal (*Estate of Baird*, 182 Cal. 338) laying down certain principles of law, an instruction to the effect that if the jury should find that the alleged father is the father and that he had no home but that of the mother of the child, and that he and the child and the latter's mother constituted the family of the alleged father, and that they resided in one house as a household and family, and that the alleged father did receive the child into his family and otherwise treat said child as if he was a legitimate child, and if they further found that the alleged father did at any time publicly acknowledge the child as his own child, then their verdict should be for the child, was erroneous in that it ignored the clandestine character of the family and the concealment and dissimulation practiced by the alleged father in his relations with the child and its mother.

[15] ID.—INSTRUCTIONS.—On such a retrial, an instruction "that a father, and his illegitimate child living with and supported by him, constitutes a family such as contemplated under section 230 of the Civil Code. Therefore, if you find from the evidence" that the alleged father and the child resided together under such circumstances would be sufficient receiving into the family under

the provisions of said section, notwithstanding the fact that the alleged father and the mother of the child were not married, was also erroneous in that it ignored what was declared in the former decision (*Estate of Baird*, 182 Cal. 338) as to the clandestine character of such "family" and the concealment and dissimulation practiced by the alleged father as the rule upon that subject.

[16] Id.—Instructions.—On such retrial, an instruction which in effect told the jury that where an unmarried man, his illegitimate child, and the child's mother live together as a household in like manner as legitimate families abide together and are established and maintained; where they abide together apart from the father's blood relatives, they constitute his family, even if the family is a clandestine one living under an assumed name, and if he receives and harbors the child as his own in such family association he receives the child into his family within the meaning of that phrase as used in section 230 of the Civil Code; and in such a case the denial and concealment of such relations from his blood relatives would not prevent a complete adoption under said section if he publicly acknowledges the child as his own, and by his conduct such association is made public, was erroneous as being contrary to the law of the case established by the decision in *Estate of Baird*, 182 Cal. 338.

[17] Id.—Prejudicial Error Arising from Instructions.—Such instructions given on a retrial of the issue of adoption, being contrary to the law of the case established in *Estate of Baird*, 182 Cal. 338, and conflicting with given correct instructions, were prejudicially erroneous within the meaning of section $4\frac{1}{2}$ of article VI of the constitution.

[18] Id. — Elements of Adoption — Section 230, Civil Code — Preponderance of Evidence. — Each of the elements necessary to constitute an adoption within the meaning of section 230 of the Civil Code must be established by a preponderance of the evidence, and if the proof fails as to any one of them a case of adoption is not made out.

[19] Id.—Section 230, Civil Code—Nature of Proceeding—Special Verdicts.—The proceeding to establish an adoption under section 230 of the Civil Code partakes of the nature of the contest of a will. If the issues are tried by jury, they must make conclusions of fact in the form of special verdicts, which must pass on all the issues by presenting the conclusions of fact bearing on all, and such issues "must be such as that the determination of them will leave to the court no office except to enter a judgment" for or against adoption.

[20] Id.—Public Acknowledgment of Paternity — Meaning of. — The term "public acknowledgment" of paternity is the opposite of

private acknowledgment; it means the same kind of acknowledgment a father would make of his legitimate child.

[21] ID. — WHAT CONSTITUTES PUBLIC ACKNOWLEDGMENT — CONCEALMENT—WILLFUL MISREPRESENTATION.—While it is not required in order to constitute public acknowledgment that the father declare his paternity under all circumstances, it would be opposed to the idea of public acknowledgment if he deliberately refrained from declaring his paternity when the occasion would naturally demand it, or misrepresented the fact, or remained silent when he would reasonably be expected to announce he was the father of the child, as, for instance, in the case of immediate relatives. A distinction will be recognized between a mere failure to disclose or publicly acknowledge paternity and a willful misrepresentation in regard to it; in such circumstances there must be no purposeful concealment of the fact of paternity.

[22] ID.—CHARACTER OF CONCEALMENT—EVIDENCE—PRESUMPTIONS.— The concealment by an alleged father of an illegitimate child from his immediate relatives except one, friends of his family, the business men whom he frequently met, and his own personal friends, of the fact that he was the father of such child is presumptive evidence that away from the environments of the mother and the child he purposely failed to acknowledge his paternity. Such conduct, under the circumstances, was the equivalent of a deliberate denial and a willful concealment of paternity.

[23] ID.—WILLFUL CONCEALMENT—PUBLIC ACKNOWLEDGMENT.—Willful concealment of the fact of paternity by the father of an illegitimate child from relatives with whom he is in frequent intercourse and is on terms of affection is opposed to public acknowledgment of paternity.

[24] ID.—RECEIPT INTO FAMILY—WHAT CONSTITUTES.—So far as the element of receipt into the family is concerned, the father of an illegitimate child, in order to comply with section 230 of the Civil Code, must have a home or habitation into which he shall receive his illegitimate child as his own, and the place where he lives must be his settled or fixed habitation of which he is the head.

[25] ID. — WHAT CONSTITUTES "FAMILY." — Where the father of an illegitimate child lives in a home alone, such home may constitute a "family" into which he may receive the child, or where the father and mother of an illegitimate child live in a home or habitation of which the former is the head, although they are not married, the father has a "family" within the meaning of section 230 of the Civil Code, into which the illegitimate child may be received.

---

21. What amounts to recognition within statutes affecting status or rights of illegitimates, note, L. R. A. 1916E, 659.

[26] ID.—EVIDENCE—INTENT.—On this appeal involving the question of adoption of an illegitimate child within the meaning of section 230 of the Civil Code, giving the evidence its fullest import in favor of the child, the failure of the father to publicly acknowledge his paternity, the clandestine nature of the "family," and the isolation of the child from the father's relatives and friends, represented a deliberate purpose on the part of the father to keep them in ignorance of the child, and under the circumstances shown this alone was sufficient to defeat an adoption.

APPEAL from a decree of partial distribution of the Superior Court of the City and County of San Francisco and from special verdicts on issues concerning adoption of an illegitimate child. T. I. Fitzpatrick, Judge. Reversed.

The facts are stated in the opinion of the court.

Mastick & Partridge, Karl C. Partridge and Joseph T. O'Connor for Appellants.

C. M. Fickert, E. A. Cunha, R. P. Henshall and Robert R. Moody for Respondent.

LAWLOR, J.—The petitioner, David Jennings Baird, a minor, by Lydia M. Valencia, guardian of his person and estate, filed an amended petition praying for partial distribution to him of the above-entitled estate as the adopted child and heir of decedent. The petition alleges that petitioner is the illegitimate son of Miss Valencia and decedent; that decedent died after the birth of petitioner and that before his death, and within the meaning of section 230 of the Civil Code, he adopted petitioner as his own child; that petitioner is the sole surviving issue and only child of decedent; that decedent left an estate consisting of real and personal property; and that he made a last will in which no provision was made for petitioner. Petitioner prayed an order of court distributing to him the whole of decedent's estate, or such part thereof as the court shall direct, on the delivery of a bond to the executor and executrix of the said will. An answer, denying, among other things, that petitioner is the child of, that he was adopted by or was in any way related to decedent, was filed by I. I. Brown, executor of

said will, and by Veronica C. Baird, as executrix of and legatee and devisee under the said will.

The issues of adoption were tried by jury and the special verdicts were in favor of petitioner. The court adopted the special verdicts of the jury, made findings of fact and conclusions of law, and entered its decree of partial distribution awarding to petitioner twenty $1,000 Liberty bonds, 221 shares of the capital stock of the Sausalito Land and Ferry Company, and an undivided fourth interest—decedent's whole interest—in certain lands situate in Contra Costa County. An appeal from the verdict, from the entry thereof and from the order and judgment was taken by Veronica C. Baird, individually, and as legatee and devisee under the said will of decedent, and as assignee of the interest of her sons, Miles T., Benjamin H., and Thomas R. Baird, as legatees and devisees under the said will. A second appeal from the decree of distribution was taken by Veronica C., Benjamin H., and Thomas R. Baird. A third appeal was taken from the verdict, from the entry thereof, from the order and judgment, and from the whole thereof, by C. H. Williams and R. C. Farley, individually; Adelaide McColgan, administratrix with the will annexed of the estate of D. A. McColgan, deceased, and F. W. Morrison and R. C. Farley, as trustees.

This is the third trial of the issues of adoption. The first was had before the court sitting without a jury. Judgment was given against respondent and it was reversed on appeal upon the ground that the court erred in refusing his demand for a trial by jury. (*Estate of Baird,* 173 Cal. 617 [160 Pac. 1078].) The second trial was by jury and the verdicts and judgment were in favor of respondent. The judgment in that case was reversed upon the ground that a case of adoption had not been established. (*Estate of Baird,* 182 Cal. 338 [188 Pac. 43].)

The claim of respondent is that beginning a year before the birth of the child decedent and Miss Valencia, although not married, accomplished all the relations of man and wife and that she had no sexual intercourse with any other man; that from the date of respondent's birth until his own death decedent publicly acknowledged his paternity; that with Miss Valencia he had a family in the St. Helen and Octavia Apartments and at 230 I Street, in the city and county of

San Francisco, into which he received respondent and that he otherwise treated him as a legitimate child.

Respondent was born in the St. Helen Apartments at 5 A. M., December 7, 1906, and following a debauch decedent died in the house at 230 I Street at 10 or 11 o'clock on the morning of November 25, 1908, a few months after he passed into his twenty-ninth year.

According to the evidence, Miss Valencia and decedent first met in 1898 and beginning in 1902 they entered upon an illicit relationship which continued until his death. Miss Valencia claims that they lived together as man and wife and that the relationship would have ripened into marriage but for the opposition of his relatives. Appellants claim that decedent associated with Miss Valencia for purposes of dissipation and illicit sexual intercourse and that the relationship had no other significance. Decedent never married. Prior to the San Francisco disaster on April 18, 1906, the couple occupied the relation of mistress and lover in several abodes in San Francisco. At the time of the fire their relationship was being carried on in the Alexandria Apartments at 570 O'Farrell Street. A week or ten days later they took up quarters at 1310 Divisadero Street in a cottage owned by Miss Valencia's mother. The next abode was at the St. Helen Apartments at 2070 O'Farrell Street. They occupied this apartment for six or seven months, then moved to a room at the Octavia Apartments, and from there to a house at 230 I Street, which was purchased by decedent for Miss Valencia. Following his death the place was sold and Miss Valencia received what was left.

Throughout the relationship between decedent and Miss Valencia he had relatives with whom he associated when they were in San Francisco. His mother, Mrs. Veronica C. Baird, a widow, visited Europe annually. He had a sister, a brother, Miles T. Baird, and two half-brothers, Benjamin H. and Thomas R. Baird. His eldest brother, John R. Baird, died in an accident in San Francisco in December, 1905. The sister married about this time and with her husband located in New York, but made occasional visits to San Francisco. During the entire period of his relationship with Miss Valencia decedent maintained quarters in hotels and other places in San Francisco, where at times he lived with his relatives.

1. Appellants' first contention is that the second decision (*Estate of Baird*, 182 Cal. 338 [188 Pac. 43]) established the law of the case and that there is no change in the record herein in the essential facts upon which the above decision was based as to the asserted receipt of respondent into the family of the decedent and otherwise treating him as a legitimate child. Respondent's position is that the principle of the law of the case has no application whatever to the trial of an issue of fact. It is claimed that the decision on the former appeal was a decision on a question of fact and not of law and that therefore the doctrine of the law of the case does not apply. We quote what was said by respondent after asserting that important evidence must have been overlooked in the department decision: "In the present instance it is not necessary to consider the question whether important evidence in favor of petitioner was overlooked on the former appeal for the reason that many new witnesses and much additional evidence was introduced on the last trial to which the previous decision of this court, not having had it before it, could have no application whatever."

Since appellants claim the evidence on this trial is substantially the same as on the last, and respondent contends it is different, and is sufficient to justify an affirmance of the judgment, we will discuss the former decision (*Estate of Baird*, 182 Cal. 338 [188 Pac. 43]). And as respondent seeks to avoid the effects of the former decision and claims it is not only erroneous but that it does not establish the law of the case, it will be proper to consider the contention, although the nature and effect and the scope of the doctrine have been so frequently considered in this state that further discussion of the subject would seem to be a work of supererogation.

The reasons for the rule known as the law of the case are not always stated in the same way; in fact, various reasons have been assigned for this well-established principle. At the outset of the discussion, and before commenting upon the cases cited by the respondent, we may say that an excellent discussion of the subject of the law of the case as established in this state will be found in 2 California Jurisprudence, 944, beginning with section 555, to and including section 569. The reason for the rule is stated in section 556. We will not undertake an elaborate discussion of the multitude

of authorities in this state upon the subject of the law of
the case. In a discussion of the principle excerpts from
opinions may be misleading or entirely inaccurate. For in-
stance, one of the cases relied upon by the respondent is
*Allen* v. *Bryant,* 155 Cal. 256 [100 Pac. 704]), where it is
said: "The sole reason for the existence of the doctrine is
that the court, having announced a rule of law applicable to a
retrial of facts, both parties upon that retrial are assumed
to have conformed to the rule and to have offered their
evidence under it. Under these circumstances it would
be a manifest injustice to either party to change the rule
upon the second appeal." If this were the sole reason for
the existence of the principle it might be true that in this
case we would be justified in disregarding the law of the
case for the reason that upon the last trial the respondent,
at least in his proposed instructions to the jury, hereinafter
discussed, did not attempt to conform to the rule laid down
upon the former appeal. There are, however, other reasons
for the rule sufficiently set forth in the section cited in 2
California Jurisprudence, to which we shall refer without
further discussion.

[1] The rule of the law of the case may be succinctly
stated as the rule requiring both trial and appellate courts
to follow the rules laid down upon a former appeal whether
such rules are right or wrong. [2] It is sufficiently obvi-
ous as scarcely to require a statement of the proposition upon
this appeal that the decision of this court upon the second
appeal established as the law of the case that all the evi-
dence adduced at the previous trial was insufficient as a
matter of law to establish a legal adoption of the child. If
any authority is needed for so obvious a proposition it will
be found in a decision by this court in Bank in *Brett* v. *S. H.
Frank & Co.,* 162 Cal. 735, 738 [124 Pac. 437]. It was there
held that a decision on appeal that the evidence in the case
was insufficient to go to the jury and that the court should
have granted a nonsuit was the law of the case, and that
where the evidence upon the next appeal was not materially
different the law of the case should control in the decision,
both in the superior and appellate courts. The rule is also
well stated by Mr. Justice Hart in the opinion of the district
court of appeal, third district, in *Merchants' Nat. Bank* v.

*Carmichael,* 50 Cal. App. 749 [196 Pac. 76], with a collation of the authorities, as follows:

"If then, it be true that, as counsel for respondent contend is the fact, the evidence received at the two trials of the action is substantially the same in all vital particulars, it of necessity follows that the doctrine of the law of the case applies, and per consequence the instrument sued on must be held to involve a stated account; and this would be so even if it were necessary to concede that the Supreme Court was in error in holding that said instrument involved an account stated. (See 2 Hayne, New Trial and Appeal, p. 1658; *Dewey* v. *Gray,* 2 Cal. 374; *Clary* v. *Hoagland,* 6 Cal. 685; *Gunter* v. *Laffan,* 7 Cal. 588; *Cordier* v. *Schloss,* 18 Cal. 576; *Phelan* v. *S. F.,* 20 Cal. 39; *Haynes* v. *Meeks,* 20 Cal. 288; *Davidson* v. *Dallas,* 15 Cal. 75; *Ritter* v. *Stevenson,* 11 Cal. 27; *Learned* v. *Castle,* 78 Cal. 454 [18 Pac. 872, 21 Pac. 11]; *Burton* v. *Burton,* 79 Cal. 490 [21 Pac. 847]; *Emeric* v. *Alvarado,* 90 Cal. 444 [27 Pac. 356]; *Jaffe* v. *Skae,* 48 Cal. 540; *Sharpstein* v. *Friedlander,* 63 Cal. 78; *Blankenship* v. *Whaley,* 142 Cal. 566 [76 Pac. 235]; *Franz* v. *Mendonca,* 146 Cal. 640 [80 Pac. 1078]; *Lambert* v. *Bates,* 148 Cal. 146 [82 Pac. 767]; *Ellis* v. *Witmer,* 148 Cal. 528 [83 Pac. 800]; *Emerson* v. *Yosemite,* 149 Cal. 50 [85 Pac. 122]; *Reeve* v. *Colusa,* 151 Cal. 29 [91 Pac. 802].)"

[3] Upon the second appeal the court will not only look to the opinion of the court on the previous appeal, but also to the record for the purpose of determining whether or not the law of the case should control in the determination of the second appeal (*McKinlay* v. *Tuttle,* 42 Cal. 570, 576; *Otten* v. *Spreckels,* 183 Cal. 252, 254 [191 Pac. 11]). The respondent, after stating the rule of the law of the case, claims that this principle has no application whatever to the trial of an issue of fact. To avoid misunderstanding, we quote in part from the brief as follows:

"The decision of an Appellate Court upon a law point is, of course, controlling even if erroneous through all subsequent proceedings in the case, both in the trial court and in the Appellate Court again. There can be no question that this is the law in California as it is in every other jurisdiction. This principle has no application whatever to the trial of an issue of fact, otherwise it would be quite unnecessary for the Supreme Court ever to grant a new trial.

Granting a new trial is for the purpose of setting the case at large so that the successful party, against whom a decision has been reversed, may make out a better case and that the other side, if errors have been committed against him, may conduct himself in such a manner as to obtain a decision in his favor. It is not a decision that the testimony of the witnesses is not to be believed nor does it preclude the trial court from receiving the former evidence and drawing from that evidence any proper conclusions. 'It is settled beyond controversy that a decision of this court on appeal, as to a question of fact, does not become the law of the case.' *Mattingly* v. *Pennie*, 105 Cal. 514 [45 Am. St. Rep. 87, 39 Pac. 200]. It is only where the exact case is again presented to the trial court upon the same evidence that the doctrine of the law of the case has any application and even, in that instance, its application is very much modified by certain principles to which we now direct attention. . . . "

In support of this contention the case of *Allen* v. *Bryant*, *supra*, is cited. It is claimed that this decision establishes two principles which we will state in the language of the respondent: "First, that the application of the doctrine of the law of the case does not apply where the evidence is different and, secondly, that it does not apply where it appears that the previous decision overlooked important evidence, . . . " As we have already pointed out, neither of these propositions is supported by the authorities. **[4]** The evidence may be different and yet unless it is substantially different in a material respect, the doctrine of the law of the case applies, and it applies notwithstanding the fact that in the previous decision evidence contained in the record is not quoted or cited in the opinion. These principles are established by the case of *Brett* v. *S. H. Frank & Co.*, *supra*, and the case of *McKinlay* v. *Tuttle*, *supra*.

**[5]** The appellate courts in this state have no jurisdiction to pass upon questions of fact as distinguished from questions of law. If the court should inadvertently attempt to decide a question of fact as distinguished from a question of law, that decision would, of course, not be binding. **[6]** As we have already said, however, to determine that the evidence adduced at the trial, with all the inferences properly deducible therefrom, does not support the claim of adoption, is a determination of a question of law.

We have declared that under the doctrine of the law of the case the decision rendered upon the former appeal is binding both upon the trial court and upon this court. There are statements in some opinions by this court which justify some further discussion of that matter in view of the fact that the respondent insists that the former opinion is not binding because it passed upon a question of fact. In the case of *Sneed* v. *Osborn*, 25 Cal. 619, 628, this court, in denying a petition for rehearing, declared: ''Facts are stated, in the opinion of the Court, solely that the course of reasoning adopted by the Court, and the principles enunciated, may be the better understood. The Court does not assume to find the facts in a case, for it has no authority to do so, except in case where an ultimate fact results, as a conclusion of law, from the proof of certain prior facts. If this Court states the evidence in a cause, whether correctly or incorrectly, the statement in no manner controls the Court below, and cannot prejudice the parties, where a new trial is had. It is upon questions of law, that the decision of the appellate court becomes the law of the case, and not upon questions of fact.'' This observation of the court in denying a rehearing was directed to a situation where the court for the purpose of deciding the questions of law involved in the case states sufficient of the facts involved to disclose the pertinence of the law points decided. It had no reference to a case where the whole decision turned upon the sufficiency of the facts established by the record to support the judgment of the trial court.

In the case of *Robinson* v. *Thornton*, 114 Cal. 275 [46 Pac. 79], it was said, with reference to a prior decision in the case: ''But it was further decided . . . that the evidence taken at the former trial was sufficient to warrant the finding that Thornton did have such possession for said statutory period, and the judgment was reversed on account of said adverse possession of Thornton. But the question of such adverse possession is one of fact, and upon a subsequent trial the jury were not estopped by the decision of this court from finding the issue of such adverse possession differently from the finding at the former trial. They might have found that issue differently, even though the testimony was the same as at the former trial, but, as a matter of fact, there was at the latter trial additional testimony on that

point. It was for the jury, therefore, to determine whether or not there was such adverse possession; and the court erred in taking that question away from the jury.'' As we understand the authority it merely holds that when the question of adverse possession is involved in a case upon conflicting evidence, the jury may decide either way, and if upon one appeal it is held that there was sufficient evidence of adverse possession to support a finding and judgment based upon such adverse possession, upon a retrial the court or jury may determine the conflict in exactly the opposite way and would not be precluded from doing so because of the fact that on a former appeal the court has held there was sufficient evidence to justify a finding to the contrary. The case is not authority for holding that where upon an appeal the court has held the evidence insufficient as a matter of law to establish a fact, the same question can again be submitted to a jury and decided adversely to the conclusion of the appellate court upon the matter of law.

The decision of this court in *Sneed* v. *Osborn, supra,* and the decision in *Wallace* v. *Sisson,* 114 Cal. 42 [45 Pac. 1000], are cited in the opinion in *Allen* v. *Bryant, supra,* in support of the doctrine there enunciated. The decision in *Wallace* v. *Sisson, supra,* was concurred in by only three justices in Bank upon the point to which that case is cited, and was concurred in by the fourth justice (Garoutte) upon the ground that the evidence in the record under review was not the same as that presented to the court upon the former appeal. The point concurred in by three justices in Bank was not a decision by the court. If the opinion in *Allen* v. *Bryant, supra,* justifies the contention of the respondent, it is not supported by the authorities cited and is in conflict with and in effect overruled by the subsequent decisions of this court hereinabove cited. This must be true because a decision by this court that the evidence is insufficient to justify a finding or a judgment is necessarily a decision upon a question of law, for upon no other theory could the court pass upon the question. It should be further said with reference to the decision in *Allen* v. *Bryant, supra,* that upon the second appeal the court was of the opinion that upon the former appeal the district court of appeal had invaded the province of the jury in passing upon the credibility of witnesses.

[7] It is clear from the foregoing discussion that the last decision was a decision upon a question of law and not of fact, and that without regard to the correctness of the statement of the evidence, or the legal principles declared therein said decision established the law of the case and was binding on the court below as it is binding here.

2. We will next consider respondent's contention that the first Department decision (*Estate of Baird*, 173 Cal. 617 [160 Pac. 1078]), established the law of the case. Respondent's contention is that there is a conflict between the first and the second Department decision and that ''it is not at all clear that this conflict in these decisions does not take away the application of the rule of the law of the case and set everything at large under the decision of this Court in the case of *Gage* v. *Downey*, 94 Cal. 241 [29 Pac. 635]. This much, however, is clear, the petitioner has as much a right to invoke the application of the law of the case based on the first decision rendered by Mr. Justice Shaw as the appellants in this case have a right to apply the rule of the law of the case based on the second decision.'' [8] In view of the fact that the concurrence of one of the justices was limited to the single ground that the trial court erred in refusing respondent's demand for a jury trial, the decision on that question would alone constitute the law of the case since the concurrence of three justices is necessary for a Department decision. (Sec. 2, art. VI, Const.; see, also, sec. 4, art. VI, Const., as to the district courts of appeal before the amendment of November 5, 1918; *Turner* v. *Fidelity Loan Concern*, 2 Cal. App. 122, 141 [83 Pac. 62, 70]; *Matter of Coburn*, 165 Cal. 202 [131 Pac. 352].) In addition to this, the first Department decision expressly refrained from passing on the sufficiency of the evidence to constitute an adoption in these words: ''Nothing we have said is to be taken as an expression of opinion on our part regarding the sufficiency of the evidence to prove that the decedent received the child into his family and treated it as if it were a legitimate child.''

3. We will now take up respondent's contention that the additional evidence received on the last trial put the case at large so that the doctrine of the law of the case does not apply.

Appellants' briefs have undertaken to segregate the additional from the former evidence, but respondent's brief, after contending that the doctrine of the law of the case does not apply, presents both classes of evidence together. The testimony relied on in this connection is, first, that of Miss Valencia's masseuse, who did not testify on the second trial, to the effect that in a conversation with decedent in the St. Helen Apartment while Miss Valencia was present the witness asked him why they did not get married. His reply was that they would "some day but it cannot be done now. My mother is too prejudiced, she is too bitter . . . against him presumably being married to Miss Valencia"; that she asked him if he had not shown his mother the baby and offered to take it to his mother, but he said: "She is too bitter . . . it would not do any good, she is made of stone. . . . Q. Did Mr. Baird indicate to you at that time in his conversation whether or not his mother knew about the baby being in existence? A. He said his mother knew of the beautiful baby, that he himself had told her, but that she did not—she turned a deaf ear to it all. Q. He said though, that she had never seen the baby? A. He said she had never seen the baby, that she did not want to see the baby." In Miss Valencia's testimony as to the asserted incident she did not state that decedent said his mother knew about respondent.

We will at this point consider the purpose for which this testimony is competent. The position of appellants with reference to it. is that it cannot aid respondent because, "It is not evidence that Mrs. Baird did know of the existence of the child, or that deceased ever did tell her of it. . . . If offered as proof of the fact that decedent did tell his mother of the child, this evidence would have been clearly hearsay and inadmissible. It was, however, admissible as bearing upon decedent's attitude toward the child."

Section 1853 of the Code of Civil Procedure declares: "The declaration, act or omission of a decedent, having sufficient knowledge of the subject, against his pecuniary interest, is also admissible as evidence to that extent against his successor in interest." Section 1870, subdivision 2, of the Code of Civil Procedure, provides: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: 2. The act, declaration, or omission of a party, as

evidence against such party." The testimony of this witness cannot be regarded as a declaration against interest, for to be competent as such the declaration must, in the absence of a statute, be against a pecuniary or proprietary interest at the time when made. (*Smith* v. *Hanson,* 34 Utah, 171 [18 L. R. A. (N. S.) 520, 96 Pac. 1087].) Here any interest of decedent which might have been involved at the time he made the asserted statement was entirely too remote to give it probative value within the requirements of a declaration against interest. As distinguished from a declaration against interest the statement was an admission to the witness of paternity and of his attitude toward the child. [9] We conclude that the statement of decedent in the conversation with the masseuse was an admission of his paternity and of his attitude toward the child, propositions as to which a great deal of evidence was introduced in the former trials; it was, however, not competent evidence that decedent told his mother of the existence of the child. It follows that the part of this testimony which is competent is addressed to the elements of paternity and public acknowledgment—which were assumed in the last Department opinion to have been established. We do not understand that respondent's brief claims the evidence was admissible other than as tending to prove public acknowledgment of paternity.

The portion of the testimony of this witness held to be admissible, whether it be regarded as tending to prove public acknowledgment or as showing the attitude of decedent toward the child, presents no new principle; but, as we have stated, it was not competent to prove decedent told his mother of respondent.

The next additional evidence was furnished by Miss Valencia. She testified to the effect that in 1905, when decedent, his mother, and a Miss Klein, a friend of the Baird family, were returning from a European trip, she took the same train from Chicago to New York and occupied a berth adjoining the one occupied by Mrs. Baird; that Mrs. Baird upset an ink bottle, asked Miss Valencia's permission to sit in the same seat with her while the damage was being repaired, which request was granted, and that she recognized Mrs. Baird and thinks "she must have known me"; that Mrs. Baird suddenly left the seat and called to her son; that at dinner-time he said to her: "You must leave this train";

193 Cal.—16

that she heard his mother say "she would not travel an inch with that Valencia woman. You put her off this train"; that with his mother he left for San Francisco that evening but Miss Valencia remained over in Chicago two days, and he met her at the ferry when she arrived in San Francisco. Mrs. Baird, in her deposition, disclaimed any knowledge of Miss Valencia being on the same train with her and her party.

Miss Valencia also supplied this additional evidence: She testified for the first time that she met Mrs. Baird at the physician's office when decedent was confined in the sanitarium, but that she would not recognize her; that the Baird family had her arrested for vagrancy in 1903 on a complaint sworn to by the attorney for the Baird family. The occasion of decedent being in the hospital will be later referred to. She also testified that Mrs. Baird tried to have her excluded from the hospital but that decedent told the physician he wished her to come. Two police officers, one in rebuttal, neither of whom appeared in the earlier trials, also testified that Miss Valencia was arrested on the charge of vagrancy in 1903 and that it was dismissed in the police court. They also testified that decedent protested the arrest and Miss Valencia quoted him as saying he would tell the attorney "to lay off this business and let you live in San Francisco, and I will have him tell the family, my sister and my mother, to leave us alone." It may be assumed from this and other evidence on the point the jury inferred that in 1903, about the time it is claimed decedent tried to borrow $5,000 from his sister to get rid of Miss Valencia, the attorney for the Baird family swore to the complaint in question and that he and decedent's sister were active in an attempt to break up the relationship.

Miss Valencia also testified that before leaving 1310 Divisadero Street to go to the St. Helen Apartments, two police officers came there and said to her, "Well, we have orders to come here and back up a wagon for you"; that decedent told her he had been to the police station about the matter and said: "You will not have any more trouble, I told them you were my wife and this was my baby, and I was supporting this place." The child was not born at the time and when this was called to her attention she offered an explanation. Miss Valencia was the only witness who

testified to this asserted incident. Under the rule applied to the testimony of the masseuse the statement imputed to decedent that he would tell the attorney to deliver his message to his relatives is not evidence that it was delivered, nor is the statement of the police officers proof that his relatives knew the couple lived together at 1310 Divisadero Street or that they were responsible for the statement of the police officers. Miss Valencia also testified that Mrs. Baird saw her and the child at a dry-goods store "more than once" in January, 1908; that she only stared at them and walked out of the store because they were there; and that when Mrs. Baird's deposition was being taken she refused to remain in the same room with Miss Valencia. The latter enlarged on her former testimony that the ring "Dave to Dodie" was a wedding ring given to her before the birth of respondent; that decedent always wanted to marry her, and of her refusal to marry him when one of the unmarried couples, later referred to, were married in Redwood City a few weeks before he died.

The physican gave additional testimony to the effect that when decedent was in the sanitarium Mrs. Baird asked him if he would prohibit Miss Valencia from calling on the patient; that she referred to Miss Valencia as a very bad woman, and that she asked him if he knew they were not married, to which he answered "yes." Mrs. Baird denied that she had seen Miss Valencia at the sanitarium and the physician said he did not believe she had. On the last trial the physician made this additional statement: "Dave had asked me to keep this quiet as long as I could. He did not want me to file the certificate at all. Neither did Miss Valencia. But it was the law, so I had to do it. I went to the Health Office. At that time Dr. . . . was in the office. . . . I asked him to keep that certificate from getting into the papers, so Mrs. Baird would not find it out. . . . David Baird asked me not to file the birth certificate so his mother would not find it out. I asked the man in charge of the Health Office to hold it up and keep it out of the newspapers, that David wanted it."

The deposition of the milliner was not offered on the second trial, but was read into the record on the third. Her testimony is to the effect that she saw decedent at the abodes playing with respondent; that they went by the name of

"Tyler" but that she did business with decedent under his true name and knew Miss Valencia as "Mrs. David J. Baird." This new evidence is clearly cumulative as it is addressed to subjects concerning which a great deal of testimony had been received on the former trials.

Two real estate partners testified that about two months prior to decedent's demise he commissioned them to sell the place at 230 I Street, and to secure a house north of the park in the Richmond district; but that decedent's death intervened to prevent the transaction from going through. In connection with the proposed property deal Miss Valencia testified that decedent was at that time planning "*to take her and the baby away from San Francisco for good.*" This apparent inconsistency was sought to be explained on crossexamination. A shoe clerk testified that decedent told him he would marry Miss Valencia when they were settled at 230 I Street.

Miss Valencia's additional evidence presents no new facts within the contemplation of the rule. The portion covering the asserted train incident, the meetings with Mrs. Baird in the physician's office, the episode at the taking of the deposition, the occasions at the dry-goods store, the arrest for vagrancy, and the action of the officers at 1310 Divisadero Street, all tend to prove Mrs. Baird's hostility toward her, as did the statements made by Mrs. Baird to the physician, but, as will presently be shown, the hostility of Mrs. Baird and her daughter toward Miss Valencia was to be inferred from the evidence on the previous trials. The additional testimony of the physician covering his efforts to keep the contents of the birth certificate out of the newspapers is along the line of his previous statements that decedent did not want his mother to know about respondent and that he thought it was the fault of the board of health the certificate was not seasonably filed. .

[10] At this point we will state the legal test by which it is to be determined whether the change in the evidence is sufficient to avoid the rule of the law of the case.

The authorities use such expressions as that the new evidence must be "materially," "essentially," or "substantially" different before it can be held the doctrine does not apply. (2 Cal. Jur., "Appeal and Error," sec. 557 et seq.; *Brett* v. *S. H. Frank Co.*, 162 Cal. 735 [124 Pac. 437]; *McEwen* v. *New York Life Ins. Co.*, 187 Cal. 144 [201 Pac.

577] ; *Burns* v. *Jackson,* 53 Cal. App. 345, 347 [200 Pac. 80] ; *Young* v. *Southern Pac. Co.,* 189 Cal. 746 [210 Pac. 259] ; *Estate of Cook,* 83 Cal. 415 [23 Pac. 392] ; *Heidt* v. *Minor,* 113 Cal. 385 [45 Pac. 700] ; *Daniel* v. *Smith,* 75 Cal. 548 [17 Pac. 683] ; *Muller* v. *Swanton,* 17 Cal. App. 232 [119 Pac. 200] ; *Morrell* v. *San Tomas Drying etc. Co.,* 30 Cal. App. 194 [157 Pac. 818.]) The rule is binding as to questions which involve and are controlled by the same principles (*Tally* v. *Ganahl,* 151 Cal. 418 [90 Pac. 1049]). **[11]** Additional evidence merely cumulative to evidence of the same class given on the first appeal will not carry a question outside the operation of the rule as to the law of the case, but to successfully escape the rule a new and substantial fact must be brought into the case on the subsequent appeal. (*Alerding* v. *Allison,* 170 Ind. 252 [127 Am. St. Rep. 363, 83 N. E. 1006].)

**[12]** None of the additional evidence is essentially different from that received on the second trial. It does not present any new substantive fact, it involves no new principle, and where it supplements the former evidence it comes under the cumulative rule.

**[13]** 4. We will pause at this point to consider respondent's contention that the additional evidence answers paragraphs H and I of the law of the case, *infra.* Concisely stated, the claim is that because of the hostility of the Baird family toward the mother and the child decedent did not acknowledge his paternity nor introduce respondent to his relatives.

In discussing the subject matter of paragraph I of the law of the case, *infra,* it is argued that, "In the former appeal it was ruled as one of the grounds of reversal that the illegitimate child was not introduced to and known by the decedent's mother and his blood relatives. In the present case evidence was introduced to show why the child was never taken to decedent's mother. This evidence related to the hostility of the mother and of decedent's family toward the child's mother and to the child itself, and to the necessity which the decedent was under of keeping the child and its mother away from his family."

First, with respect to the *animus* of the Baird family toward Miss Valencia. Notwithstanding the evidence is not new on this trial, we will describe in this connection certain episodes asserted to have occurred in 1903–4, which may be

conceded to be the basis of such hostility as Mrs. Baird and her daughter entertained for Miss Valencia.

Early in the litigation the depositions of Mrs. Baird and her daughter were taken. They were read in evidence on each of the three trials. It appears from these depositions that the sister of decedent testified that in the fore part of 1903 she was notified over the telephone to come to 318 O'Farrell Street—"the Kingston"—to get decedent or he would be turned over to the authorities. The witness testified she found him suffering from delirium tremens in a room in which she afterward learned Miss Valencia lived, and that when decedent saw her he exclaimed, "Oh, my God, have they brought you here?" He was taken by his sister to the residence at 2513 Pacific Avenue, where he was then residing with her and to whom he appeared on the following morning to be in a more irrational state of mind. However, she observed, as he lay in bed, a pistol on his mattress as he declared, "Those thieves have taken my watch and I am going after them." She became alarmed and reported the matter to the police commissioner, a friend of the Baird family. This and other circumstances lead us to conclude that the jury would have been justified in inferring that the charge of vagrancy emanated from the police commissioner and decedent's sister. The witness also testified that not long after the above incident she was informed over the telephone by a Mrs. Rogers, residing at 1776 Pacific Avenue, that a plot had been hatched to marry decedent to Miss Valencia. She quotes Mrs. Rogers to the effect that the ceremony was to be performed at a beach resort, and that a colored minister was to officiate. The witness enlisted the aid of her brother, who, with a friend of the family, called at 1776 Pacific Avenue, but it appears Mrs. Rogers was not in. Nothing further appears in the record concerning the incident.

According to the sister it was about this time decedent tried to borrow the $5,000 from her to buy Miss Valencia off. Concerning this proposal a meeting was held in the office of the family attorney, and evidently the money was refused, the witness declaring she did not believe Miss Valencia would go away. The sister testified this was the first time she ever heard of Miss Valencia. As we understand the record, the next event which was brought to the atten-

tion of decedent's relatives was when an account of the asserted stabbing of decedent by Miss Valencia appeared in the newspapers. Miss Valencia's version of decedent's injury was that he was cut by a piece of glass; the physician described it as a lacerated wound. Decedent's sister discussed Miss Valencia with her brother and said he "ought to quit— . . . that he had given us enough notoriety."

It would appear from the evidence that Mrs. Baird was in Europe at the time of decedent's attack of delirium tremens, the marriage plot, and the money matter. She testified to a conversation with her daughter on her return, however, and stated, "She told me that David was going with some woman by the name of Valencia; that she didn't think she was a very nice woman." The witness asserted this was the first time she ever heard of Miss Valencia. Mrs. Baird was in San Francisco, however, when decedent was taken to the hospital, and upon reading about it in the newspapers she visited him at the sanitarium. He told her he had been "cut by this woman"; begged her pardon and said he was "very sorry such a thing had happened to him, that he was quit of this woman, and he promised he would never have anything more to do with her." We will presently discuss the testimony of Miss Valencia and the physician, from which it appeared decedent did not intend to keep the promise to his mother.

Mrs. Baird testified that when she was in Europe in 1905, Mrs. Hopkins, a friend of the family, quoted the sister to the effect that the Baird Estate advanced money to decedent to get rid of Miss Valencia. The Baird Estate collected a claim against decedent's estate for $7,700, represented by his promissory note dated November 1, 1905. There is no other testimony connecting Miss Valencia with this money and it does not appear she was questioned about it. The note must have been executed after decedent returned with his mother from the European trip of 1905, when it is claimed the train incident occurred.

Decedent's sister also testified that in 1904 a warrant of arrest was caused to be issued to take decedent into custody on a charge of insanity, and that after the San Francisco disaster, and up to the time of decedent's demise, she was not aware the couple kept up their relations.

Whatever the merits of the evidence touching these episodes may be, we do not attempt to decide. Our purpose in referring to this evidence is to show that Mrs. Baird and her daughter had learned of Miss Valencia as early as 1903; that they must have condemned her association with decedent, and that their attitude toward her has been a part of the evidence on all the trials.

Now, with regard to the claim that the members of the Baird family were hostile to respondent. There is no evidence tending to dispute the testimony of Mrs. Baird and her daughter that the first time they heard of the child was after decedent's death. Of course, if they did not know of the baby before that event respondent's present contention must fail.

Upon this point we will review the evidence as to each member of the Baird family. The testimony of Miss Valencia is that when Miles T. Baird called at the St. Helen Apartment in April, 1907, before leaving for Australia, the child was asleep in another room, and that decedent remarked to him, referring to respondent: "Miles, he is a dandy. He beats your boy all hollow." The connection of this brother with the case is singular, to say the least, and upon the surface of things unaccountable. He never testified for either side, and respondent offered evidence that he was in King City at the time of the last trial. In one part of the record there is a mention of his deposition, but if one was taken it has not appeared in evidence. Some time following his departure for Australia, in 1908 it seems, his mother joined him at Hull, England, and together they journeyed to San Francisco, arriving after decedent's death.

It appears that this brother had transactions with Miss Valencia following decedent's demise. It was suggested that Miss Valencia knew Miles T. Baird before the relationship with his brother was formed. Questioned on the point she answered: "That has always been the opinion but I did not." By way of supporting the claim that decedent had his residence with the mother and child, it was testified he kept his clothes in those places. The wardrobe was not produced by respondent at the trial, and there is evidence that an extensive wardrobe was found in decedent's room at the Fairmont Hotel after his death. Accounting for her failure to produce the wardrobe at the trial, Miss Valencia

explained that when Miles T. Baird was prosecuted on a criminal charge after his return to San Francisco and was released, he had no money and appealed to her for decedent's clothes, which she gave to him. The other side submitted evidence that about this time he gave Miss Valencia a check for $150, which check was not honored. It also appears from her testimony that there were other money transactions between them. At all events, it is not claimed that Miles T. Baird was hostile to respondent.

Benjamin H. Baird related a conversation he had with decedent at the Hotel Robins in September, 1908, at which time the witness stated decedent had been drinking and seemed greatly worried. We quote: "I am ashamed to walk the streets"—owing to Miss Valencia's claim that he was the father of respondent. When asked why he drank so much he answered: " 'That is the only peace I have, is when I am drinking. . . . This woman, Dodie Valencia, has gotten it all around that a child she has is his.' I said, 'Why don't you put a stop to it?' and he said, 'I am cut up enough now.' . . . "

It is not claimed that Thomas R. Baird ever heard of the relationship or of respondent before decedent's death.

Notwithstanding the evidence to the contrary, it is claimed that Miles T. Baird and Benjamin H. Baird must have informed Mrs. Baird and her daughter of the child after they learned of its existence. As already indicated, Miles T. Baird talked with decedent about respondent in April, 1907, and joined his mother in England in 1908, but there is absolutely no evidence that he mentioned the child to her, to his sister, or to his half-brothers. In the state of the record, to hold to the contrary would be to draw one inference from another. So, too, as to Benjamin H. Baird. He testified he did not repeat to his relatives the conversation he had with decedent at the Hotel Robins about the mother and child. Moreover, his mother was in Europe and his sister in New York from the date of the conversation until after decedent died. It is also claimed that the colored family coachman or his wife must have mentioned respondent to Mrs. Baird. The records show the coachman testified on the first and second trials but not on the last trial. His wife did not testify at all. His testimony was to the effect that a member of a well-known San Francisco family told

him it was being claimed decedent was the father of a child; also that a downtown merchant said to him: "Well, Miss Dodie Valencia claims that she has a baby by David." The witness describes himself as backing away and refusing to listen. He testified that about a month after the incident with the merchant he repeated the statement to decedent who denounced it as a lie and concluded with an aggressive remark about the merchant. The witness denied mentioning the matter to Mrs. Baird. He served the family for thirty-five or forty years and it is stated in respondent's brief that because Mrs. Baird presented him with a home he was no doubt influenced in his testimony. Here, again, there is no foundation for an inference that the witness repeated to the other members of the Baird family what had been said to him about the baby. The same rule applies to other testimony. It was shown there were photographs of respondent in decedent's room at the Fairmont Hotel at the time of his death and it is claimed an inference is justified that Mrs. Baird saw the photographs, that she inquired about them and thus learned of respondent's existence. But here, too, to draw an inference from this circumstance alone would be to enter the realm of speculation and conjecture.

The testimony of the masseuse that the couple used the name of "Tyler" because of the hostility of Mrs. Baird to the mother and child is open to the objection that it was hearsay. At most it was a conclusion of the witness. It does not appear that she ever saw or came in contact with Mrs. Baird or had any knowledge of her bearing toward the mother or the child. The testimony of the milliner as to Mrs. Baird's attitude and the reason for the use of the name "Tyler" is objectionable upon similar grounds. Miss Valencia's testimony touching the asserted visits of Mrs. Baird to the dry-goods store is essentially a conclusion of the witness and is not evidence that Mrs. Baird knew or recognized the mother or the child.

Another point is made in this connection. Answering the statement in the last Department decision that decedent was not estranged from his relatives the claim is made that from the time the association of Miss Valencia and decedent began he separated himself from his blood relatives, was estranged from them, and that their intercourse thereafter was confined to business matters connected with the Baird

Estate. The claim of separation and estrangement is entirely without foundation. No evidence has been offered to controvert the statement in the opinion that the relations between decedent and his mother were of the most intimate and affectionate. character. When John R. Baird, his eldest brother, died in December, 1905, decedent was most solicitous for his mother in her bereavement. For a time he slept in the same room with her and constantly showed her every attention. We have stated he was with her in Europe in 1905. He joined her and Benjamin H. Baird in the home of his sister in New York in the winter of 1907–8 on their return from Europe. The relations between decedent and his sister and brothers were such as usually obtain between relatives of that degree. His half-brothers, when they were in San Francisco, were frequently in his company and were entertained by him. In support of the claim of estrangement the point is made that decedent's sister had urged the mother not to give money to the boys, but there is no intimation that she sought any advantage for herself in making this suggestion. The mother was, nevertheless, generous with her sons. It is shown that there was a difference of opinion between decedent and his sister as to two business matters. When she was keeping house for her brothers at 2513 Pacific Avenue the decedent refused to pay what she regarded as his proportion of the cost of some concrete and other work about the premises. He took the position that the regular monthly sum he paid was in full for everything. They failed to agree on this point and decedent gave up his room and went to live at the Grand Hotel, which was his home at the time of the asserted stabbing. The second incident occurred. on January 4, 1908, while visiting his sister in New York after the European trip of his mother and Benjamin H. Baird. He tried to sell his sister a portion of his stock in the Baird Estate. She declined the offer and said she would advise her mother not to buy it, but that they each would give him $1,000 to help him along. He became angry at this, and, according to her testimony, his relations with her were somewhat strained during the remainder of the visit. His mother decided to purchase the shares. The party remained in New York until January 9th, when they started for San Francisco, arriving on January 13th. It is these three incidents upon which respondent must base the

claim that decedent was estranged from his relatives. There is evidence that decedent corresponded with his sister and that when he was abroad in 1905 he sent her a gift. The briefs of appellants do not question that following the episodes referred to both the daughter and her mother were opposed to decedent's relations with Miss Valencia, but it nowhere appears that the disclosures ever disturbed the affectionate regard the members of the family had for each other; and there is no trace of proof to the contrary. When the relatives were in San Francisco decedent was frequently in their company and their relations with him appeared to be harmonious. On Christmas Day, 1906, less than three weeks after the birth of the child, Mrs. Baird had her sons at dinner, and until she left for Europe in April, 1907, the decedent was often in her company. He provided for his mother and half-brothers in his will and expressed himself as satisfied with it in 1907, nearly a year after the birth of respondent and at the very time it is claimed he was estranged from his relatives.

Finally, it may be assumed in the light of the evidence that apart from the child decedent's relatives would be opposed to any kind of relations between him and Miss Valencia. But this has appeared to be the fact ever since the litigation was entered upon. It would, however, require something more than the bare assertions in respondent's brief to justify us in holding that if decedent evinced a desire to adopt the innocent child his relatives would have been hostile to the idea, or if they were, it would prevent him from making him his heir. There is no phase of the evidence in this case which would justify us either in concluding that in addition to Miles T. Baird decedent's other relatives knew of the child, or that their attitude in respect to it was responsible for decedent's failure to treat respondent as the father of a legitimate child would treat his offspring.

5. It is claimed by appellants that certain instructions proposed by respondent and given to the jury ignore the principles of law laid down in the last Department decision on the issues of receipt into family and otherwise treating the child as legitimate. In this connection it is argued that when these instructions are compared with other instructions that were given in accordance with the principles laid down

in the decision "it is impossible to tell which was adopted by the jury in reaching their verdict (*Rathbun* v. *White*, 157 Cal. 248, 253 [107 Pac. 309])." We are satisfied appellants' contention must be sustained.

Upon the last appeal it was necessary to lay down certain principles of law and to determine whether or not the evidence in the case satisfied those principles, failing in which it was declared that the evidence was insufficient to sustain the judgment. These principles were not only announced in the last Department decision in plain and unmistakable terms, but were embodied in the instructions given to the jury upon the trial now under review.

The court on the last trial gave to the jury paragraphs F, G, and I of the law of the case, *infra*, substantially in the language of the decision.

That the last Department decision established these principles as a matter of law was clearly recognized by the respondent in the petition for hearing in Bank filed upon the second appeal. We will quote from that petition some of the statements therein set forth in black-faced type, not for the purpose of binding the respondent by the more or less hastily prepared petition, but for the purpose of showing that the respondent then recognized that the decision did establish certain principles of law which, of course, would be controlling upon a new trial. It was asserted in the petition for hearing in Bank after the last Department decision: "The record establishes that the decedent received the petitioner into his family as his child and a member of his family. . . . Any objection that the existence of decedent's family with petitioner was concealed from decedent's mother and other blood kindred goes to the point of public acknowledgment, and it has no force in respect to the condition of reception into family and treatment as a legitimate child where paternity and public acknowledgment of paternity are admitted. . . . The Department opinion erroneously rules that decedent's reception into his family of petitioner as his child, was invalidated for the purposes of Section 230, Civil Code, by reason of concealment of the existence of the family from decedent's mother and other blood relations. . . . The decedent's attitude and conduct toward petitioner establish his receipt of petitioner into his family as his child and member of his family. . . . The Department

opinion erroneously declares a rule that in cases arising under Section 230 where the father is a bachelor, proof of his treatment of his child as if it were a legitimate child, is not complete unless it includes evidence that the father informed his blood kindred of the child's existence and his family with the child. . . . The Department overlooked, or failed to consider as material, a condition of the evidence showing that during a period of nine months while decedent was living with petitioner and petitioner's mother, in a household and home in San Francisco, and decedent performing daily acts evidencing that he had received petitioner into his family, and was in every way treating petitioner as if he were a legitimate child, the decedent's mother, sister and brothers were without the State of California, and that during such period the adoption of petitioner was complete, and under circumstances where objection on account of any charges of concealment would be untenable, if such an objection could be tenable in any case. . . . The opinion concedes that decedent did not attempt to conceal his relations with petitioner and petitioner's mother, and that there was evidence that he freely, frequently and publicly proclaimed their relations. . . . The weight of the testimony concerning decedent using the assumed name of Tyler and his alleged concealment of the existence of petitioner and of decedent's family with petitioner, was a question specially considered in the trial Court. . . . The opinion assumes a different state of facts concerning alleged cordiality between decedent and his kindred than is shown by the record, and gives such assumption false weight in overturning the verdict and judgment of the trial Court. . . . The Department opinion overlooks the force of evidence of public acknowledgment in eliminating all idea of concealment, and in its bearing on receipt into the family and otherwise treating the child as a legitimate child."

[14] With this statement by the respondent before it, as to the nature and effect of the last Department decision, the court in Bank denied the petition for hearing therein. Having thus unsuccessfully petitioned this court in Bank for a rectification of the asserted errors in the decision in Department, the respondent was apparently more successful in the trial court, for that court instructed the jury in accordance with some of the contentions advanced in his peti-

tion for hearing in Bank and in his briefs upon the previous appeal, which instructions he now seeks to justify and uphold upon the ground that the last Department decision was erroneous and that it was, therefore, unnecessary for the trial court to follow it. The instructions we are about to quote are inconsistent with those we have heretofore referred to in this opinion, also given by the trial court, and are in part as follows: "If you find from the evidence that the deceased is petitioner's father and that deceased had no home but that of Lydia Valencia, and that the deceased and petitioner and petitioner's mother constituted the family of deceased, and that they resided in one house as a household and family, and that the deceased did receive the petitioner into his said family and otherwise treat said petitioner as if he was a legitimate child, and if you find further that the deceased did at any time publicly acknowledge the petitioner as his own child, then your verdict should be for the petitioner."

This instruction entirely ignored the main point in the case, namely, the clandestine character of the family and the concealment and dissimulation practiced by the decedent in his relations with the child and its mother.

[15] Another erroneous instruction was given upon the same subject, as follows: "The court instructs you that a father and his illegitimate child living with and supported by him constitutes a family such as contemplated under section 230 of the Civil Code. Therefore, if you find from the evidence that David J. Baird, the deceased, and David Jennings Baird, Jr., the petitioner herein, resided together under such circumstances would be sufficient receiving into the family under the provisions of said section, notwithstanding the fact that the deceased and the mother of the petitioner were not married." This instruction also wholly ignores what was declared in the last Department decision as to the clandestine character of such "family" and the concealment and dissimulation practiced by decedent as the rule upon that subject was established by the said decision.

Another erroneous instruction was given which covered not only the subject of whether or not decedent received the child into his family, but also the question of public acknowledgment and the subject of otherwise treating the child. We will, for convenience, italicize portions of the instruction

to be subsequently quoted and referred to. The instruction is as follows: ''The law of this state establishes that an association between an adult unmarried father and his illegitimate child and the child's mother may constitute a family. This family is established by the living together as a household in like manner as legitimate families abide together, and are established and maintained. Therefore, *if such father and child and mistress establish a household and home maintained by the father, where they abide together apart from the father's blood relatives, and this association and manner of living* together is proved by competent testimony, *the status of family is impressed upon such association. And if* such association is made public by the conduct of *the father* in his manner of living with his child and mistress, and he publicly acknowledges the child to be his own child, and receives and harbours the child as his own in such family association, and *otherwise treats the child in the manner that fathers of legitimate families treat their children,* and this public acknowledgment of paternity and association, between the father and child, is proved by the testimony of strangers, neighbors, tradesmen and friends and acquaintances of the father, *the law determines from such evidence that the father has effectually adopted his child under the provisions of section 230 of the Civil Code. In such a case, the failure of the father to advise his blood relatives of his relations with the child, or his denial and concealment of such relations from his blood relatives, would not prevent a complete adoption under section 230 of the Civil Code.''*

[16] This instruction in its effect under the evidence may be epitomized as follows: Where an unmarried man, his illegitimate child, and the child's mother live together as a household in like manner as legitimate families abide together and are established and maintained; where they abide together apart from the father's blood relatives, they constitute his family, even if the family is a clandestine one living under an assumed name, and if he receives and harbors the child as his own in such family association he *receives the child into his family* within the meaning of that phrase as used in section 230 of the Civil Code. In such a case the *denial and concealment of such relations from his blood relatives would not prevent a complete adop-*

*tion under section 230 of the Civil Code* if he publicly acknowledges the child as his own, and by his conduct such association is made public.

It will be observed that this instruction is complete in itself, for, after stating the various considerations which may result in adoption, it is said under such circumstances "the father has effectually adopted his child under the provisions of section 230 of the Civil Code."

This instruction is directly in the teeth of the decision of this court upon the second appeal. It not only completely ignores the clandestine character of the family in determining whether or not the relationship under consideration is sufficient to constitute a family within the rule announced in the second decision, but it is also for that reason inconsistent with the other instructions to which we have referred.

The instruction not only permits the jury to determine that the relationship between the decedent, the child, and its mother constituted a family, although that relationship was clandestine, as above stated, but it also deals with the question of the public acknowledgment of the child and the question of whether or not it was *otherwise treated as his own.*

The instruction now under consideration upon the latter subject is as follows: "And if . . . the father . . . *otherwise treats the child in the manner that fathers of legitimate families treat their children* . . . the law determines from such evidence that the father has effectually adopted his child under the provisions of section 230 of the Civil Code. *In such a case, the failure of the father to advise his blood relatives of his relations with the child, or his denial and concealment of such relations from his blood relatives, would not prevent a complete adoption under section 230 of the Civil Code."*

The instruction as a whole is in accordance with the view of the law unsuccessfully contended for by respondent in his petition for hearing in Bank above quoted as follows: "Any objection that the existence of decedent's family with petitioner was concealed from decedent's mother and other blood kindred goes to the point of public acknowledgment, and it has no force in respect to the condition of reception into family and treatment as a legitimate child where

198 Cal.—17

paternity and public acknowledgment of paternity are admitted.''

Respondent does not seek to justify these erroneous instructions otherwise than by attacking the last Department decision, which criticisms we will consider under the next head.

We have held that the law laid down in the last Department opinion became the law of the case. The principles thus declared are in accord with the evidence and the law. But even if this were not so, those declarations were binding on the trial court as they are binding here. The trial court had no alternative in ruling on the evidence and in instructing the jury but to follow the law declared in the last Department decision. [17] It was no part of the trial court's function to determine whether the former appeal had been correctly decided; its sole duty was to follow without question the principles established by that decision. This the trial court failed to do, and the instructions we have condemned are therefore prejudicially erroneous within the meaning of the constitution (sec. 4½, art. VI).

6. We will, before bringing to a close the consideration of the general subject of the law of the case, and as in a sense entering into it, take up respondent's attack on the last Department decision as indicated by the following quotations from his brief:

''A perusal of the transcript will, however, demonstrate that one of two things is certainly true: (1) either the evidence is essentially different on this appeal or (2) this court upon the former appeal made a grave mistake in its decision by overlooking evidence establishing the fact that decedent did receive petitioner into his family and did treat him as if he were a legitimate child. Without any intended reflection upon this court, we will hereafter point out that the author of the decision in the *Estate of Baird,* 182 Cal. 338 [188 Pac. 43], not only overlooked much testimony favoring the contention of petitioner and which the trial court and jury found to be true, but the decision gave a false coloring to the testimony in spite of the fact that the opinion says: 'We shall resolve every question of fact in favor of petitioner.' We respectfully take issue with any claim that the opinion correctly or fairly sets forth the conditions of the evidence, and we submit that a fair consideration of the

record in that case will convince that the opinion has re-
solved all questions of fact adversely to the petitioner even
against the accumulated testimony of numbers of witnesses
upon single points, and against the findings of the trial .
court and jury, that such testimony is true. . . . ''

We have purposely refrained from quoting the entire brief
upon the subject, because if the attack does not pass beyond
the bounds of just criticism, it is in any event not entitled
to a place in the opinion of this court.    There is nothing new
in this contention now advanced by the respondent, for ex-
actly the same contention was presented by the petition for
hearing in Bank upon the former appeal and determined
against respondent by a denial of that petition, all of the
justices concurring except Kerrigan, J., *pro tempore,* who
did not act.    It is, for instance, stated: ''It thus appears
that the Department ignores the rule that in appeals the
decision of the trial court is final on the question of credi-
bility of witnesses and the weight of testimony.    That the
decedent gave the utmost publicity to the fact of his pater-
nity of petitioner; and that his family consisted of himself,
petitioner and petitioner's mother, and that he abided and
had his home with his family at the St. Helen's Apartments
and afterwards at the Octavia Apartments, and then at 230
I Street from October, 1907, until his death on November
25, 1908, is established by such a large mass of testimony,
determined by the trial court and jury to be true, that it
is compelling on this court, under the law and practice
governing the decision of appeals, to give full credit to such
testimony to support the judgment appealed from.''    This
objection thus stated in the petition for hearing in Bank
and now repeated in the briefs upon this appeal was not
considered by the court of sufficient importance to require
another hearing or a modification of the opinion.    Inasmuch,
however, as the respondent has persisted in his views, and
as the trial court apparently accepted that view on the trial,
we will further consider the contention.

The statements and discussion of the evidence in the peti-
tion for hearing in Bank involve the following paragraphs
from the last Department opinion, which we will designate
herein as paragraphs A, B, and C, respectively:

A.   ''A mass of evidence was introduced in support of
and against the claim of adoption, but in the consideration

of the question here we shall assume that upon the evidence, the verdict of the jury and the findings of the court, it was established that the decedent was the natural father of petitioner, and that he publicly acknowledged him as his own child. We will therefore discuss the evidence with special reference to the remaining propositions—whether petitioner was received into the family of the decedent, and by him otherwise treated as a legitimate child, and view it in the light most favorable to petitioner.''

B.  ''In this summary of the evidence we have not attempted to cover every phase thereof, nor the numerous inquiries on cross-examination, nor the many apparent contradictions and inconsistencies as shown by the voluminous record before us, for the reason, as already indicated, that we shall resolve every question of fact in favor of petitioner. It may, however, contribute to a more complete understanding of the evidence to mention that the decedent in his relations with the mother of the child led a life of reckless dissipation, being habitually under the influence of intoxicants, and otherwise showing great demoralization; that for the most part the persons who figured prominently in their illicit relationship (excluding neighbors and those with whom they had business dealings), and upon whose testimony the case of petitioner very greatly depends, came into the life of the decedent through such relationship, some of them of loose morals and just the kind of characters it might be expected would be their mutual companions, associates, and friends.  There are frequent references to lively automobile parties, the bill in one month for automobile hire amounting to over six hundred dollars, and, according to the evidence, only one man ever sharing with the decedent the expense of such entertainment; and to trips to the beach, to roadhouses, to cafés and the like, on occasions the entire night being given over to that kind of diversion.''

C.  ''In this case the couple masqueraded as man and wife under a fictitious name assumed by the father and mother and given to the child in order to keep the decedent's family in ignorance of the meretricious relationship and of the child.  As we have seen, the decedent was on cordial and intimate terms with the members of the Baird family.  He constantly canvassed the affairs of the Baird estate with them, had other interests in common with them,

corresponded with his mother and sister, arranged for the schooling of his half-brothers, and one year made a trip to New York to meet his mother on her return from Europe so that he might journey to San Francisco with her and other members of the family. In short, the relations between the decedent and his relatives clearly appear to be such, considering their respective modes of living, as usually obtain between a bachelor son and his relatives with whom he is on terms of cordial and affectionate intimacy, and plainly suggest that the motive for his course of conduct towards petitioner was to spare the Baird family humiliation. We think this is true in spite of the testimony of several of respondent's witnesses, from which it might be inferred that the decedent seized every opportunity to proclaim his shame, going so far, according to the testimony of the attending physician, as to name the child 'David Jennings Baird.' This witness, who had known Miss Valencia and the decedent for several years before petitioner was born, stated that he obtained the data for the birth certificate from the decedent, who was reluctant to give the information because 'he wanted to keep it from his mother.' It is worthy of mention that the birth certificate was not filed until February 14, 1907—more than two months after the birth of petitioner. This physician also stated that when he sent bills for his services to the decedent to the apartment or to the house he used the name 'Tyler,' and when to the Palace Hotel or the Fairmont Hotel, the name of 'Baird.' "

We quote the following paragraphs from the law of the case and refer to them herein as paragraphs D, E, F, G, H, and I, respectively:

D. "If this was a family, it was a clandestine family, using the word 'clandestine' to describe the character of the family rather than the relationship that existed between the father and the mother of the child."

E. "It is the attitude of the father toward and his conduct in respect to the child, and not the character of his relationship with the mother, which is the true test in determining whether the child was received into the family of the father."

F. "It would be a violation of the letter and spirit of the statute to hold that 'the father of an illegitimate child' has received it 'into his family,' where the existence of the

'family' rests upon concealment and dissimulation well calculated to keep from his own relatives, who are living in the same community and with whom he is on terms of intimacy, all knowledge either of the child or of 'his family.' ''

G.  "The evidence leads us to the conclusion that where the unmarried father of an illegitimate child lives in the same community and maintains constant relations with his own legitimate family, and at the same time, under an assumed name, maintains the illegitimate child clandestinely in another home with its mother, with whom he lives in illicit relations a great part of his time, he is not receiving the child as his own 'into his family,' within the meaning of section 230 of the Civil Code."

H.  "But, even if it be true from the testimony on behalf of respondent, that the decedent maintained an establishment at the places where the mother and the child lived which had something of the character of a family in the sense in which that term is used in some of the decisions, although clandestine with respect to his legitimate family, it cannot be denied, on the other hand, that he did not treat the child as if it were a legitimate child.  A father of a legitimate child, under such circumstances, does not cause or allow it to be known by an assumed name.  If he wanted the child to be deemed legitimate, he would have it known by his own name, he would naturally refer to it when associating with his own mother, sister, and brothers, and he would either take the child to see them or have them see the child. If he had been estranged from his own family he might not have done so, but that was not the case.  When his relatives were in San Francisco he was associating with them as a member of the family during all of the time, yet he never in any sense treated the child as he would a legitimate child so far as they were concerned.  It is a circumstance proper to be considered in determining this question that when the decedent discussed his will with I. I. Brown, whom he named as his executor, some time after the birth of petitioner, he made no change therein."

I.  "Where the father of an illegitimate child has members of his own family living in the same community, with whom he is in almost constant association and maintains cordial relations, he does not treat the child as if it was a legitimate child, if he conceals its existence from such mem-

bers of his real family, never has them visit the child or has the child visit them, or in any other manner acts toward the child with regard to his own legitimate relatives as any father reasonably would do if he intended to adopt the child as his own and treat it as his legitimate child. Such treatment is contrary to the sense in which section 230 of the Civil Code uses the phrase 'otherwise treating it as if it were a legitimate child.' The treating it as if it were legitimate is as essential to a legal adoption under that section as any of the other elements therein mentioned. Because of the want of such treatment we are of the opinion that there was no adoption.''

The evidence on the issues of paternity and public acknowledgment thereof was assumed for the purposes of the last Department decision to be sufficient. This dispensed with the necessity of describing the evidence particularly addressed to those issues, or even of making a close summary of it. Touching the other issues of adoption—receipt into family and otherwise treating the child as legitimate—it was not so much a question of what facts must be held under the rule of decision on appeal to have been established by the evidence for respondent as it was a lack of facts to satisfy the requirements of section 230 of the Civil Code on those issues. And yet, in the face of this legal situation, plainly appearing in the decision, the brief for respondent is largely made up of repetitive statements and discussion of the evidence under all the issues, except paternity, of criticisms of the opinion and of the testimony of the witnesses for the other side. It has been shown in division 1 of this opinion that the law laid down in the decision became the law of the case on those two issues—that is to say, the evidence was not sufficient as matter of law to establish receipt of respondent into the ''family'' of decedent or that he otherwise treated the child as legitimate. The law thus stated remained the law of the case on the third trial until or unless new facts were presented sufficient to put the case at large. Yet it is argued in respondent's brief that the judgment was reversed on a question of fact, and not one of law, and that the first decision (*Estate of Baird,* 173 Cal. 617 [160 Pac. 1078]), notwithstanding its own clear statement that it did not pass on the above issues, established the law of the case. As we have stated, no attempt was made

by respondent to segregate the additional from the other evidence. The brief, in dealing with the question of the additional evidence, did not show as a distinct proposition whether or not the principles of law declared under the evidence on those issues governed the third trial. Of the 247 pages of the brief, the discussion of the doctrine of the law of the case occupies sixteen and the assignments of error in the rulings and in the instructions fourteen pages, the remaining pages being devoted principally to a review of what is claimed is all of the evidence on the said three issues of adoption, and to criticisms of the opinion and of the witnesses for appellants. But notwithstanding we have held the law of the case did apply to the last trial we will consider generally the criticisms of the decision.

As to the first criticism it is sufficient to say that we have shown in division 3 of this opinion that the evidence on the third trial is not essentially different. With reference to the second contention that the decision overlooked much testimony favoring respondent and gave a false coloring to that bearing on the issues of receipt into family and otherwise treating the child as legitimate, it will be noted that paragraph B of the facts, *supra*, states that the opinion did not attempt to cover every phase of the proof. It is also to be noted that the evidence concerning the "family" and decedent's attitude toward and his conduct in respect to respondent, including the use of the name "Tyler," and the conditions that marked the places where the child was kept, came almost entirely from the witnesses for that side. The difficulty was not the failure to take the evidence into account and present it in its true color, but the failure of counsel for respondent to present the evidence as it is and to give legal effect to its import. For instance, it is claimed the child was always known by decedent's true name, and yet the witnesses for respondent disprove such claim. This contention is on par with the statement "that decedent gave the utmost publicity to the fact of his paternity" when the record shows that with the exception of Miles T. Baird he never acknowledged the child to his relatives or to his friends.

A comparison of the testimony summarized in the opinion with that presented by the record of the second trial makes it clear that no phase of the evidence important to the issues

upon which the decision turned was ignored, but that it was stated, considered, and applied subject to the rule of decision on appeal. It appears from the decision that the evidence as to decedent's attitude toward the child and his conduct with respect to it in the environments where it was kept was accepted as true, but that even accepting the evidence as true, it was not sufficient, in the face of the clandestine "family" and the isolation of the child from decedent's relatives, to establish the issues to which the evidence was addressed. The evidence as to decedent's life among his relatives, the places he held out to the community as his residence before and after the birth of the child, and as to whether his relatives knew of the child's existence was supplied by the witnesses for appellants, some of it taking the form of documentary evidence, hotel books of account, checks, bills, vouchers, and the like. To put it in another way, generally speaking, respondent's witnesses depicted decedent's relations with the mother and his attitude toward and his conduct touching the child, and appellants, his relations with his relatives and friends and the friends of the Baird family. It is clear from the decision that the rule applied in *Fowden* v. *Pacific Coast Steamship Co.*, 149 Cal. 151 [86 Pac. 178], cited by respondent, was followed—that, "It is the duty of the appellate court to sustain the verdict when there is a substantial conflict of the evidence, no matter how much it may preponderate upon the other side." This rule was observed upon every question of fact. Every fact which, under that rule, would be deemed to exist in favor of respondent was so applied. And where the evidence of either side was not contradicted, either directly or indirectly, it was accepted under the familiar rule that where uncontradicted evidence is not inherently improbable, it will be held sufficient to decide a question of fact. And no fact was deemed established by appellants, even when not directly involved by counter evidence, if under the rule of decision on appeal it stood opposed to the facts established by respondent, or to the inferences arising therefrom.

It is plain the opinion did not question the testimony of respondent's witnesses but that it was accepted as true and given proper legal effect. The theory of the opinion was that conceding to have been established every fact claimed by respondent from the testimony of his witnesses, as matter

of law decedent neither received the child into his family nor otherwise treated him as legitimate. This will be made plain by what will be said in division 7 of this opinion on those issues.

To illustrate the manner of considering the evidence in the opinion: The decision assumed as true the testimony of the physician that decedent gave him the legal data for the birth certificate, including the name for the baby, and as to the circumstances attending the filing of the birth certificate. It also accepted as true Miss Valencia's testimony, variant as it was in many particulars, including the statement that decedent always intended to marry her, and this notwithstanding the uncontradicted testimony of Benjamin H. Baird as to decedent's declarations concerning her character. And the many statements imputed by Miss Valencia and other witnesses of respondent to one whose lips were sealed in death (*Estate of Emerson,* 175 Cal. 724 [167 Pac. 149]), were not questioned under the rule.

It is apparent from what we have said in answer to the criticisms of the decision there is no warrant for respondent's contention that the decision resolved all questions of fact adversely to respondent, even against the accumulated testimony of his witnesses. The opinion itself demonstrates that it did not resolve all questions of fact adversely to respondent or ignore the rule that the decision of the trial court is final as to the credibility of witnesses and the weight of testimony.

Now, with regard to the statements in paragraphs B and C of the facts, *supra.* It is not to be questioned that decedent in his relations with Miss Valencia was reckless and dissipated, that he was frequently under the influence of intoxicants when he was with the mother and child and that he otherwise became greatly demoralized. Nor can there be any dissent from the statement that some of their associates were persons of loose morals and the kind of characters it might be expected would, under the circumstances of the relationship, be their companions and friends. There are many references in the evidence to drinking places where women keep appointments with men; visits to and drinking at the race-track. There are allusions to meetings in saloons, cafés, on the beach and elsewhere, when there was much drinking; to well-known characters, bartenders, saloon-keepers,

café proprietors and habitués of a certain section of the city before the great fire. For a considerable time the mother and child took their meals in a well-known café. The proprietor of one of these places frequented by the couple figures in the testimony in connection with the effort of decedent to borrow $5,000 from his sister with which to buy Miss Valencia off in 1903, and he is numbered with other men as being on intimate terms with her. We will not pause to review the testimony as to the automobile parties in and out of San Francisco when, as one of the chauffeurs testified, they did not "miss many places where there was a good deal of liquor." Respondent's witnesses gave accounts of trips to the beach, to points in the interior, when the couple registered by the name of "Tyler," and when there was much drinking and dissipation, decedent practically paying all the bills. It is not too much to say that when the couple were together much of their time and that of their mutual friends was spent in that way. It appears from the record that several of their associates and friends were not called as witnesses for respondent, although the evidence shows they were closely identified with the relationship and evidently in touch with every phase of it. We have in mind, for instance, the two women, each of whom lived with a man out of wedlock. These women were close associates of Miss Valencia, and one of them, as already indicated, became the bride of her lover in Redwood City a short time before decedent died, in connection with which it was proposed that Miss Valencia and decedent do likewise. The record leaves the impression that the woman who engaged the St. Helen Apartment before the birth of respondent was a guiding spirit in all that affected the relationship and the child as will later more fully appear. Instead of overstating the facts as to the "family" an examination of the record will make it clear that the opinion kept well within the bounds of moderation in describing the manner of life decedent and Miss Valencia led together from the beginning to the end, and some of the people who figured in their relationship. No mention was made of the testimony as to Miss Valencia's reputation in the community nor to other phases of the proof dealing with the character of their relations.

In the light of the evidence hereinafter set forth we fail to understand upon what theory respondent questions the testimony of his own witnesses which justified the statement that the couple masqueraded as man and wife under an assumed name, which was given to the child. Miss Valencia insists they always lived together as man and wife, but she admits they used the fictitious name at times. The evidence shows that she was known in the community as "Lydia M. Valencia" and " 'Dodie' Valencia," and in and around the abodes as "Mrs. Tyler," "Mrs. D. V. Tyler," sometimes called "Mrs. Baird." Yet it is contended the child, less than two years of age when decedent died, was only known as "David Jennings Baird," although in the abodes decedent was also known by the name of "Tyler." It is not, we have said, claimed the name "Tyler" was never used, but it is insisted it was resorted to because of the pursuit of the couple by decedent's relatives, when there is positive evidence tending to show that neither Mrs. Baird nor her daughter ever heard of Miss Valencia prior to the episode of 1903, and the evidence is that the name "Tyler" was used by the couple from the beginning of the relationship. It also appears that among their companions and friends it was known by some they were not married, while the uninitiated assumed they were; occasionally decedent declared that they were married; on other occasions that they were going to marry. To the neighbors and to some of the visitors to the abodes they passed as man and wife. Deceit was systematically practiced both as to the character of the relationship and of the "family," and this from the birth of the baby to the death of decedent. It cannot be disputed that decedent adopted the fictitious name and used it as a part of the deception, and it is idle to argue that the relationship, the "family," and the child were not kept secret as far as decedent could accomplish it.

There is no merit in the criticism that the decision assumed to weigh the evidence in the statement that decedent's motive for his course of conduct toward respondent was to spare the Baird family humiliation, which was followed by the statement—"We think this is true in spite of the testimony of several of respondent's witnesses from which it might be inferred that the decedent seized every opportunity to proclaim his shame." The statement was based on two general

propositions,—first, that if the relationship constituted a
"family" it was a clandestine family, and, second, that the
relations between decedent and his relatives "appear to be
such, considering their respective modes of living, as usually
obtain between a bachelor son and his relatives with whom
he is on terms of cordial and affectionate intimacy." First,
did it trespass on the function of the jury and trial court?
It is apparent the opinion was not in that connection re-
viewing the evidence. The evidence had been summarized in
the preceding pages, and the excerpt complained of was
made in connection with paragraphs D, E, F, and G of the
law of the case, *supra*, on the subject of the "family," and
precedes H and I of the law of the case, *supra*, on the issue
of otherwise treating the child as legitimate. The statement
does not suggest that "the testimony of several of respond-
ent's witnesses" was not to be accepted as true; what it does
declare is that the recited propositions of fact are true in spite
of such testimony. We shall presently show that this con-
clusion is not to be questioned. In view of the context it
would be giving a forced interpretation to language to con-
tend that the words "it might be inferred" meant it *could
be* inferred that decedent proclaimed his paternity and the
"family" to his relatives and friends, as well as to those
whom he met where he kept the child. The plain purport of
the language is that because he proclaimed his paternity to
several of respondent's witnesses it *might* be inferred he
was no less reticent among his relatives and friends, when
the fact, as we have shown, is otherwise. In other words,
it might be inferred from the fact he spoke of the situation
of the "family" and the child in one environment he must
have done so in the other, for the expression "the testimony
of several of respondent's witnesses" plainly had reference
to declarations made to them by decedent in the environ-
ments of the mother and child.

The justification for the statement complained of is based
on the recited facts. What were the propositions of fact
stated to be true in spite of the testimony of respondent's
witnesses? (1) That the couple masqueraded as man and
wife; (2) that they assumed a fictitious name; (3) that they
gave such name to respondent; (4) that the purpose was to
keep the Baird family in ignorance of the relationship and
of the child; (5) that the relations between decedent and

his relatives were such as usually obtain where a bachelor son and his relatives are on terms of cordial and affectionate intimacy, and (6) that the motive for his course of conduct toward respondent was to spare the Baird family humiliation.

We will not repeat what we have said as to the first three propositions of fact. The statement in the opinion as to the attitude of decedent and his relatives toward each other was correct. Respondent denies the ''family'' was clandestine and affirms decedent was estranged from the Baird family. Neither proposition can be maintained. A point is made on the evidence that decedent kept up the association after he promised his mother he would have no more to do with Miss Valencia, following the episode in which it was claimed he was stabbed by her. The testimony of Miss Valencia and the physician on the point would seem to indicate that decedent did not intend to keep his promise to his mother, but that would only be further evidence that out of regard for her sensibilities he sought to delude her. When the uncontradicted evidence of his attitude toward his mother is considered no doubt will remain that it was his definite purpose to prevent his reckless and immoral conduct from causing her humiliation and pain. Apparently the relatives endeavored to keep from her the truth as to the life he was leading, for she states in referring to a certain point of time she did not believe the relationship was ''then'' being carried on. In considering the motive for decedent's attitude toward his relatives with respect to the child it is to be kept in view that he was financially independent of his relatives and that in a material sense he could follow the bent of his own will.

There is therefore no merit in respondent's contention that the statement in the opinion following the above propositions of fact involved an assumption of the functions of the jury. The point is made that the statement in the opinion that the father of a legitimate child would not allow it to be known by an assumed name is contradictory of the other statement that according to the physician decedent gave respondent his own name. The answer to this is first that the evidence of respondent's witnesses shows he was known by an assumed name, and, second, that the testimony of the physician makes it clear that in no real evidential sense did decedent intend to give his own name to respondent, at least

so far as Mrs. Baird was concerned, and it would seem that in keeping knowledge of the child from her it would be kept from his sister and his half-brothers. It is plain from the physician's testimony that through his action the data contained in the birth certificate *"never came to light"* and it would appear it was never intended to thereby proclaim the birth of respondent. It must be concluded from his testimony that in giving any data for the birth certificate decedent acted under what he was led to regard as legal compulsion, for the reason that there is no dispute that he wanted the existence of the child kept a secret from his mother. There is not a trace of evidence in the record that the fact of the child's birth ever became known through the filing of the certificate. Hence all that can be claimed from the filing is that it was a constructive proclamation of the birth of the child. What is concerned here is not the legal effect of filing the certificate, but the question of fact whether decedent ever intended to give respondent the name of Baird. In short, the question is one of intention and it must be regarded as settled against the claim of respondent by the doctor, whose testimony on the point is self-effacing.

Respondent questions the statement in the last opinion that the facts of the cases of *Estate of Gird, supra,* and *Estate of Jones, supra,* and *Estate of McNamara,* 181 Cal. 82 [7 A. L. R. 313, 183 Pac. 552], "differ so widely from those in the case at bar that we do not think it is necessary to discuss them, for in no case has it been held that a family constituted as this 'family' was, as shown by the uncontroverted evidence in the case, would come within the meaning of the statute." It is sufficient to distinguish those cases from this to point out that in the former the place where the child was received was the home and the only home of the father, that he was the head thereof, and that he always went by his own name. Gird never married and he lived on the Gird ranch; that was his only home. He always lived under his own name, but the children were known by the mother's married name. Jones had no other name; he was unmarried and lived alone for long periods on his cattle ranch in the mountains, which was his fixed abode; he had no other home and there is no suggestion of any other "family." The father in the McNamara case did not attempt to keep knowledge of his paternity from his relatives,

friends, or the community at large either in connection with the birth certificate or otherwise, and what we are about to quote from the opinion will plainly distinguish the case on the facts: "A more public acknowledgment than the act of McNamara in signing the child's birth certificate describing himself as the father, it would be difficult to imagine. In addition, the child was with him and its mother most of the time after its birth and the evidence shows that the relation openly assumed by him was that of father. His statements and his actions were both a public acknowledgment of the child as his and a consistent treatment of it as if it were legitimate. It was also received into his family within the meaning of the code. It has already been decided by this court that the word 'family' as used by the code in this connection does not necessarily mean relations, but may mean the family in which or as part of which the father abides. (*Estate of Gird,* 157 Cal. 542 [137 Am. St. Rep. 131, 108 Pac. 499]; *Estate of Jones,* 166 Cal. 108 [135 Pac. 288].) In this sense the only family McNamara had after the birth of the child was the child and its mother, with whom he abided with occasional absences until his death with full assumption of the relation of father, mother, and child. It is worthy of note in this connection that while McNamara was so living with Mrs. Bettencorte and her child, his sister, one of the appellants, visited and stayed with them for some days. . . . It is attempted to distinguish this case from *Estate of Jones,* *supra,* where the facts establishing an adoption were much weaker, on the ground that McNamara had no fixed habitation. The parties did change their abode several times, but it was a change of abode. They were not mere wanderers or travelers. Where they were, they made their home. When they finally moved to the place where McNamara died, they did not rent the place but actually arranged to purchase it."

Respondent relies on *Estate of Garr,* 31 Utah, 57 [86 Pac. 757], to support his claim of receipt into family. The adoption in that case was under a statute identical with section 230. One witness testified he heard John T. Garr, the alleged father, declare, and several others state that they heard his brothers charge, that the father of the boy was a man named Jones. The court said: "If that evidence is all true it cannot overbalance the weight of his deliberate admissions

to those not of kin, and of his acts and conduct toward the boy and his family. The conclusion upon all the evidence in the case is irresistible that he was in fact the father of the child.'' The controlling question in that case was whether Garr was the father of the child. It was held that he was and that upon all the evidence there was a public acknowledgment. It was not disputed that the child was openly received into the home of Garr, who called it ''Johnnie Garr,'' and that he took care of and raised him ''as was natural for a father to do.'' Here, too, the facts distinguish the authority.

It is also argued that *In re McGrew,* 183 Cal. 177 [190 Pac. 804], is authority for the proposition that the name of the child is immaterial, referring to what was said in the last Department decision concerning the use of an assumed name. The parties lived in Sonoma County and the father's name was Zimmerman—he used no other—and the mother continued to use her family name, McGrew, which was given to the child. Zimmerman tried to marry the mother, but her mother protested. Under her own name the mother of the child engaged the lodgings in San Francisco where the child was born. In holding the father adopted the child the opinion declared that ever since its birth the father *at all times* publicly acknowledged his paternity; that he received the child with the consent of its mother into his family, where he and its mother resided and kept house together; and that at all times he supported and otherwise treated the child as if it were legitimate. As indicating that the ''family'' was not clandestine and that the truth was not concealed from the relatives is the fact that the child was adopted in the city and county of San Francisco under section 226 of the Civil Code by the sister of the mother while the father was away from the mother and the child working in Lassen County. The court held that the father had previously adopted the child under section 230, and the order of adoption under section 226 was vacated on his motion upon the ground that the sister was not a resident of San Francisco when the order under section 226 was made. In that case there was one ''family'' and except when the parents stopped temporarily in the lodgings during the mother's confinement no attempt was made to disguise the situation. There is nothing in that case opposed in principle to the law laid down in the case at bar.

193 Cal.—18

7. This brings us to consider respondent's contention that the evidence received on the last trial establishes a case of adoption apart from any question of the law of the case.

Appellants do not argue on this appeal that the evidence is not legally sufficient to sustain the special verdict on the issue of paternity. We will therefore confine our discussion under this head to the remaining elements and adopt as far as they will serve the statements of the evidence contained in the last Department decision and in the preceding pages of this opinion.

Section 230 of the Civil Code provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption." [18] Within the meaning of this section each of the foregoing elements must be established by a preponderance of the evidence, and if the proof fails as to any one of them a case of adoption is not made out. [19] The proceeding to establish an adoption under section 230 partakes of the nature of the contest of a will. If the issues are tried by jury, they must make conclusions of fact in the form of special verdicts. "A special verdict must pass on all the issues by presenting the conclusions of fact bearing on all," and the issues "must be such as that the determination of them will leave to the court no office except to enter a judgment" for or against adoption. (Secs. 624 and 1314, Code Civ. Proc.; *Estate of Sanderson,* 74 Cal. 199 [15 Pac. 753]; *Estate of Benton,* 131 Cal. 472 [63 Pac. 775]; *Estate of Baird,* 173 Cal. 617 [160 Pac. 1078].) The issues submitted to and found by the jury herein purport to cover the four elements of adoption according to the terms of section 230, with the exception of special verdict No. 3, which, in finding that respondent was received into the family of decedent, does not state he was so received as his own child.

(a) First as to the issue of public acknowledgment. [20] The term public acknowledgment of paternity is the opposite of private acknowledgment. It means the same kind of acknowledgment a father would make of his legiti-

mate child. It was said in *Estate of Gird,* 157 Cal. 534, 542 [137 Am. St. Rep. 131, 108 Pac. 499] : "The language of section 230 of the Civil Code is simply 'by publicly acknowledging it as his own.' There is no provision as to what shall constitute a 'public acknowledgment,' and the words of the statute must be taken in their ordinary sense. . . . In the face of circumstances which might well be accepted as calling for explanation as to the true situation if he was not the father of these children, he never expressly denied he was such. . . . Nor is the fact he did not say anything about the matter to his brother when he visited his home shortly before his death of such importance, under the circumstances, as to forbid the conclusion of public acknowledgment." Gird's brothers and sister never lived with him in California. The rule is thus stated in *Estate of Jones,* 166 Cal. 108, 112 [135 Pac. 288] : "It was also shown that the decedent acknowledged Lester to be his own child many times, *willingly and on all occasions, as the father of a legitimate child would naturally do.*" (Italics added.) The following statement in *Estate of Jessup,* 81 Cal. 408 [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742, 22 Pac. 1028], in holding there was no public acknowledgment, applies to the conversation between decedent and Benjamin H. Baird at the Hotel Robins (p. 429) : "The fact of the boy's existence, and that Jessup was supporting him, was communicated to his brother while yet the child remained in San Francisco, by the nurse in whose charge he was. A few days afterward the brother asked Jessup about it, and asked him if it was his boy, to which Jessup replied: 'No, it ain't my boy.' " Concerning the witnesses to whom it was claimed Jessup acknowledged his paternity, the opinion further says (p. 430) : "None of these witnesses were members of Jessup's family, and with a single exception they were not persons likely to come in contact with his family. None of them were his business associates, and such of them as could in any sense be called his companions were only so during such portions of his time as he was in hiding from society. They were not persons likely to make public what he had said to them on such a subject, but rather to accept it as a matter of confidence, to be kept secret." Concerning this authority it was said in *Blythe* v. *Ayres,* 96 Cal. 532, 579 [31 Pac. 915] : "It was held in the Jessup case that the father had a family, in the

sense of brothers and sisters, with whom he was brought into frequent contact, and from whom he concealed and denied the paternity of the child, and for these reasons, and others, the court held there was no adoption." The following from *Estate of De Laveaga,* 142 Cal. 158, 168 [75 Pac. 790], just as aptly applies to the case at bar: "In fact, it seems to have been his studied purpose not to refer to or introduce the subject of his illegitimate child in his intercourse or correspondence with his parents." In *Blythe* v. *Ayres,* 96 Cal. 532, 577 [31 Pac. 915], it was said in the main opinion signed by three of the justices that this acknowledgment was also public, "for, as we have seen, the thought of concealment of the paternity of the child never entered his mind."

[21] While it is not required in order to constitute public acknowledgment that the father declare his paternity under *all* circumstances, it would be opposed to the idea of public acknowledgment if he deliberately refrained from declaring his paternity when the occasion would naturally demand it; or misrepresented the fact, or remained silent when he would reasonably be expected to announce he was the father of the child, as, for instance, in the case of immediate relatives. A distinction will be recognized between a mere failure to disclose or publicly acknowledge paternity and a willful misrepresentation in regard to it; in such circumstances there must be no purposeful concealment of the fact of paternity. In this case we have shown that with the exception of Miles T. Baird decedent never acknowledged his paternity to his relatives, his friends, or business associates, or to the friends of the Baird family.

[22] According to the evidence, decedent acknowledged his paternity to numerous persons in the places where he kept and supported the mother and child, in cafés, in stores, on automobile rides, to chauffeurs, to neighbors, to visitors in the abodes, and to others, nearly all of whom it may safely be said were persons who knew the couple and learned of the child through the illicit relationship, and who would not be likely to meet or mention respondent to decedent's relatives, friends, or business associates. With the exception noted the evidence shows that decedent limited his acknowledgments of paternity principally to such persons as were not acquainted with the Baird family and who were removed

from the surroundings where his relatives and friends would be likely to hear of the child.

Each case depends upon its own circumstances (*Estate of Gird, supra,* p. 543) and the circumstances in this case were such as to call upon decedent to acknowledge or otherwise disclose his paternity to the members of his own family, especially to his mother. He constantly associated with his half-brothers, and when his mother and sister were in San Francisco he spent much of his time in their company; yet he never spoke of respondent. It is in evidence that neither at the Christmas dinner in 1906, when respondent was less than three weeks old, nor in New York in January, 1908, after the baby had turned its first year, did he mention the child. *Estate of De Laveaga, supra,* comments on the circumstance that the father in that case did not take the child among his kindred, and the italicized expression in the Jones case indicates that in order to establish an adoption the father of an illegitimate child must willingly acknowledge his paternity on all occasions.

We have seen that to Benjamin H. Baird and to the family coachman decedent denied his paternity. To the former he expressed the opinion that another man, whose name he gave, was the father, and to the latter he spoke with vehemence in denying his paternity. The testimony of Thomas R. Baird that he never heard of the baby until decedent passed away is not denied. Mrs. Baird denied any knowledge of respondent prior to decedent's death, and the sister stated she never learned of the child until after decedent died, when word came to her in New York in the form of letters and telegrams. There is no contradiction of the testimony of a number of persons that while decedent discussed matters relating to the Baird family he never mentioned the baby to any of them, and that they never heard of the child before decedent's death. These persons consisted of friends, business associates, acquaintances, including a couple residing in New York, Mrs. Amelia Hutchins, at whose house at 1611 Vallejo Street, decedent and Benjamin H. Baird lived for a time, and where Thomas R. Baird was sometimes a visitor; the persons with whom decedent had business dealings for the Baird Estate at the very time the child was born, real estate agents, and a number of others; the employees of the hotels where he stopped, the servants of the Baird family, and other

individuals whom he frequently met and with whom he was on business or friendly terms. The contractor who did work for the Baird Estate and lived near decedent at 1611 Vallejo Street, testified he often drove decedent home and visited him in the evenings, especially during 1906-8, but that he never mentioned the child to him. A betting commissioner, whose deposition was taken on behalf of respondent early in the litigation and though never offered by that side, was introduced in evidence by appellants for the first time on this trial, said, referring to the couple: "I never heard them speak of the child with reference to the Baird family, the Baird Estate or the Bairds." The reticence of decedent as to respondent with respect to the friends of the Baird family, the business men whom he frequently met and his own personal friends, is opposed to every conception of public acknowledgment under the statute. The concealment of the fact that he was a father in the case of such persons is presumptive evidence that away from the environments of the mother and the child he purposely failed to acknowledge his paternity. Such conduct, under the circumstances, was the equivalent of a deliberate denial and a willful concealment of paternity.

The evidence of public acknowledgment relied upon by respondent is that relating to the birth certificate and the testimony of the witnesses who knew the couple through the relationship and had knowledge of the child. Respondent's brief inquires: "Under the circumstances how could he [decedent] have done anything more than he did do?" The answer is that he should not have refrained from making acknowledgment of his paternity to his relatives, friends, and business associates—the classes of persons to whom the father of a legitimate child would naturally speak of it. Effect could not be given to the statute if the father of an illegitimate child were thus permitted to discriminate between the classes and groups of persons with whom he is acquainted and who enter into the routine of his life, or who are related to him. [23] Under the terms of section 230 and such cases as *Estate of Jessup, supra,* and *Blythe* v. *Ayres, supra,* it must be held that willful concealment of the fact of paternity by the father from relatives with whom he is in frequent intercourse and is on terms of affection is opposed to public acknowledgment of paternity.

(b) In respect to the issue of receipt into family we will adopt the definition of "family" given in *Estate of Gird,*

*supra,* as stated at page 545: "As used in this section, the word 'family,' in our opinion, means no more at most than that the father must have a 'home,' *a settled place of habitation of which he is the head,* into which he must receive the child." (Italics ours.)    It is said in *Estate of Jones, supra,* at page 114: "In *Estate of De Laveaga,* 142 Cal. 169 [75 Pac. 794], the court held squarely that a man cannot adopt a child under this section unless he has a 'family, or at least a home, into which he can receive it.' In that case the father had parents, brothers, and sisters living, with whom he was on friendly terms, but he did not live with them. He also had a place of abode, but he never received the child therein *or took it among his kindred.* . . . Jones had a residence and dwelling-house which was his fixed place of abode." (Italics ours.)    It was said in the case of *Estate of Jessup, supra* (p. 434): "If he has a wife, he can only receive it into the family with her consent; but if he has no wife, he must still receive it into his family—that is to say, in such family as he has, the child must be acknowledged and treated as his—at least, he must not deny to the members of such family that it is his."

[24]    It is plain from the authorities in this state that so far as the element of receipt into the family is concerned, the father, in order to comply with section 230, must have a home or habitation into which he shall receive his illegitimate child as his own, and that the place where he lives must be his settled or fixed habitation of which he is the head.

[25]    It has been held that where the father of an illegitimate child lives in a home alone, such home may constitute a "family" into which he may receive the child, or where the father and mother of an illegitimate child live in a home or habitation of which the former is the head, although they are not married, the father has a "family" within the meaning of section 230, into which the illegitimate child may be received. (*Garner* v. *Judd,* 136 Cal. 394 [68 Pac. 1026]; *In re McGrew,* 183 Cal. 177 [190 Pac. 804]; *Estate of Gird, supra; Estate of De Laveaga, supra; Estate of Jones, supra.*)

Although the question whether the child was received into decedent's family involves the period between its birth and the death of decedent, it is proper to consider also the evidence dealing with the events and conditions that marked the relationship between decedent and the mother prior to the

birth of the baby. In other words, the entire history of the relationship should be considered if it will aid in determining whether, under the provisions of section 230, decedent had a family consisting of himself and Miss Valencia, of which he was the head and into which he received respondent.

As bearing on the question of the character of the "family" into which it is claimed the child was received it has been urged by appellants in all of the trials that Miss Valencia had lived the life of a prostitute and evidence was sought on the point. The question was put to several witnesses on this trial whether she had not been "one of the most notorious prostitutes in San Francisco," but in a number of instances objections to the questions were sustained. We shall not pause to discuss the exceptions to such rulings, or to go further than to declare that, within the rules of evidence, the fullest latitude should be allowed to prove the sort of life the couple led together, the incidents thereof, the character of Miss Valencia and her friends and associates, whether during the relationship she occupied relations with other men, the kind of places in which she and decedent lived together before the San Francisco disaster, and whether she was from the beginning to the end anything other than the mistress of decedent. Evidence of this general import would probably determine one way or the other the question of adoption more persuasively than any other form of proof. Therefore, under the record in this case when evidence of that character was competently offered it should not have been excluded. Of course, if the charge of prostitution were true, such a fact might have had a controlling effect on the special verdict of the jury on the issue we are discussing. Miss Valencia was asked on cross-examination whether she did not follow prostitution for a livelihood after the death of decedent. In the absence of any objection she declined to answer the question, but at a later session of the court her counsel brought up the inquiry again and then she said: "Absolutely not. No." On another occasion she declared she did not know what the word "prostitute" meant.

The physician was questioned as to the general reputation of Miss Valencia and of the houses in the neighborhood where decedent was claimed to have been stabbed by her. He answered that her reputation was "not very good," and

the houses were "not good—loose houses." The betting
commissioner referred to the characters who visited the
abodes after the fire, told of the people he met at the differ-
ent places, such persons as "Messenger Number 9," "The
Count," bartenders, café and saloon proprietors, men and
women who live that sort of life being included. Speaking
of the St. Helen Apartment he mentioned a saloon-keeper, a
prize-fighter, "and I remember some girls." On cross-
examination, referring to Miss Valencia, this testimony was
given: "Q. Did you ever know of her being an inmate of a
house of ill fame? A. I did, but I don't know if it was a
house of ill fame. Q. Where was that? A. The Palmer-
lee." He also stated that the woman who rented the St.
Helen Apartment lived with her at this place. Referring
to "The Palmerlee," he said, "I don't suppose it had as
good a reputation as the Palace Hotel. Q. During those
times that you knew Miss Valencia, what was her reputa-
tion? A. Her reputation wasn't very good."

The woman just referred to played a prominent part in
the affairs of the couple and she and Miss Valencia were
on terms of the closest intimacy. The woman is referred to
in the testimony by three different appellations and she was
the proprietress of the "Kingston," at 318 O'Farrell Street,
where it is claimed decedent was stabbed by Miss Valencia.
The court, saying, "We are not trying other people here,"
sustained objections of respondent to questions as to whether
this woman had not kept houses of prostitution in which
Miss Valencia was an inmate. When she engaged the St.
Helen Apartment she represented it was for "her sister"
who was about to be confined, referred to the couple as "Mr.
and Mrs. Tyler," and in giving her own name joined "Mrs."
to the surname of her lover. This couple were guests at
1310 Divisadero Street for two months, went on automobile
trips with decedent, Miss Valencia, and the baby and were
frequent visitors at the other abodes. There is a dispute
in the record as to the size of the St. Helen Apartment—
whether there were more than two rooms; there is some evi-
dence that it included a servant's room. At all events, ac-
cording to the evidence, it was occupied by the two unmarried
couples, the baby and for a time the nurse. It was testified
that decedent and the other man paid the rent. Thus it
was claimed the "family" was constituted at the St. Helen

Apartment where the child was born and where it remained with the mother until they moved to the Octavia Apartments.

The keeper of a beach resort, who testified in the case for the first time on this trial and whose place was visited by decedent when he was on the debauch which culminated in his death a few hours later, testified that Miss Valencia visited other cafés he owned before the fire and that she and decedent visited his place at the beach and would sometimes bring the baby. The witness stated that in October, 1908, about a month before decedent's death, a party of them drove down to the Fourteen Mile House and from there to Redwood City, where the marriage previously mentioned took place. The bridal couple had been very intimate with Miss Valencia and, as we have suggested, they, too, played a prominent part in the relationship, going with them on automobile trips, drinking parties and spending much of their time in the abodes. As was to be expected the bridal occasion continued in a spirit of romance, for the witness stated decedent then proposed that he and Miss Valencia make it "a four-handed party," but that she refused. We quote: "A. Yes, she said to him, 'You know your folks are very much opposed to me.' She said, 'I do not think they will accept me in any way, shape or form on account of your mother. I know your mother is very much opposed to it.' Q. She said that? A. Yes. Q. What did Dave say when she made that statement? A. He said, 'Oh, yes, I know the folks object to you and object to this marriage.' " The wedding plans had not matured when decedent died.

A married couple lived as guests for five months at 1310 Divisadero Street. The wife was introduced to Miss Valencia in 1904 in a café kept by the proprietor mentioned in division 6 of this opinion. The couple testified for respondent, the wife stating he was known as "David Jennings Baird, Jr."; she made many extended visits to the abodes. In fortifying her testimony as to her knowledge of the actual relations that existed between decedent and Miss Valencia she stated that on occasions at the Alexandria and the St. Regis Apartments she saw them undress and go to bed. The testimony concerning decedent's conduct toward Miss Valencia and the child in the various abodes; on the automobile trips to the country when the party would remain

away overnight; and to the roadhouses along the beach, comes in part from the six chauffeurs who were hired at the rate of five dollars or six dollars per hour, and who appeared as witnesses for respondent. The bill of one of them for a single month was $600, and another collected several hundred dollars from the estate of decedent for automobile hire.

Referring again to the assumed name, the nurse for the baby said the couple used the name "Tyler" and that she continued to call Miss Valencia "Mrs. Tyler" after she learned decedent's true name. The woman who engaged the St. Helen Apartment for "her sister who is to be confined," spoke of her as "Mrs. Tyler," and this was believed by those in charge to be the correct name until a package came addressed in the name of "Baird." A neighbor and his wife did not know that "Baird" was the true name of decedent until after decedent's death. The physician testified that the couple went by the name of "Tyler" at the St. Helen Apartment and 230 I Street. Miss Valencia's milliner, and her seamstress, said they went by the name of "Tyler," the former stating the baby was called "David, Little David," and the latter asserting he was not called by any name at 230 I Street. A house servant said they were known as "Tyler." The nurse who attended the confinement was told the mother was "Mrs. Tyler"; the grocery account was kept in the name of "Tyler" and the proprietress referred to the baby as the "Little Tyler boy"; the betting commissioner said they were "known as Tyler by almost everybody," and that at 1310 Divisadero Street he saw a suit box addressed to "David J. Tyler." A neighbor who knew them as Tyler testified: "They seemed to stay by themselves and no one seemed to know them. They were not acquainted with the neighbors. . . . " One of the chauffeurs said Miss Valencia was known as "Mrs. Tyler" by the tradespeople and as "Mrs. Baird" by those who knew decedent's real name. The physician testified that when he sent his bills to decedent at the abodes he used the name "Tyler," and to the hotels "Baird." It is sought to overcome the effect of such testimony by references to evidence that the couple were known by some persons as man and wife, being called "Mr. and Mrs. Baird"; that decedent on occasions introduced Miss Valencia as his wife, referring to her as "Mrs.

Baird''; that certain visitors to the abodes said the child was known as ''David Jennings Baird, Jr.''; that certain accounts, including the chauffeur's charges, were kept in decedent's true name; but in every one of these instances his real identity was known and credit may have been extended to him upon his known financial responsibility. It is true that some of these witnesses undertook to give the reasons that led the couple to use the fictitious name, but, as we have indicated, such declarations would be hearsay and merely represent the conclusions of the witnesses. It is clear, then, that by design and by systematic practice the knowledge of the association and the existence of the baby were to be kept from decedent's own relatives, his friends, and the friends of the Baird family. In addition to what we have stated concerning the birth certificate, it appeared the filing was not made until February 14, 1907—more than two months after the birth of the child and as bearing on what the last Department decision said about the delay the physician stated that he appealed to a doctor in the board of health ''to keep the certificate from getting into the papers so that Mrs. Baird would not find it out. Probably that is the reason *it did not come to light*. That is the only explanation I can make.''

In the St. Helen and Octavia Apartments the things were insured by and in the name of the woman who engaged the former and owned and conducted the latter. The house at 230 I Street was purchased by decedent on the installment plan and stood in the name of ''Lydia M. Valencia.'' Decedent made two payments on the house of $1,000 and $500 respectively, and at the time of his death $1,125 more had been paid at the rate of $75 per month. The house was insured in Miss Valencia's name; the service of gas, electricity, and water was supplied in the name of Lydia M. Valencia, and the furniture stood in the name of Miss Valencia. In the years 1907, 1908, and up to February, 1909, the telephone was listed in the name of ''Mrs. D. V. Tyler.''

It is clear that whether or not the attitude of decedent's relatives was responsible for the use of the name ''Tyler,'' that was the name decedent planned to be known by in the relationship and that was the name by which they were generally known among the uninformed in the several abodes where the child was kept. Under the evidence it is idle to

contend that decedent did not seek to hide his identity under
an assumed name in the surroundings of the mother and the
child in order to keep his relatives and friends in ignorance
of the relationship and of the child; but in such a situation
it was inevitable that their real identity should become
known to some of those who came in contact with them,
including the persons who rendered service in one capacity
or another, such as the chauffeurs, the tailors, her milliner, her
seamstress, her masseuse, the servants and the storekeepers,
who, we have suggested, may have been concerned with the
problem of getting their money. In addition to this, there
is the testimony of Benjamin H. Baird that on the day
decedent died "some woman's voice at the phone told me my
brother was very sick and that I had better come out quickly.
I said, 'Where?' She said, 'Well, out there on I Street near
Thirtieth Avenue.' She said, 'Ask at the grocery store for
the name of Tyler and they will show you the house,' which
I did." Later he saw Miss Valencia at 230 I Street. None
of this testimony is contradicted. Miss Valencia admitted
she requested the attorney for the Baird Estate over the tele-
phone to come out to the house. Being closely questioned
on the point she finally denied she gave him similar instruc-
tions about locating the place. If decedent intended the
abodes where he kept the mother and the child to be the
residence or the home of his "family" he would give such
places as his residence or home and would naturally live in
them under his own name. The record is destitute of any
evidence that decedent ever gave to his relatives, to his
friends, or to the public, any of these abodes as his home
or place of residence.

Residence has been defined as "the act or state of being
seated or settled in a place . . . the place where a man's
habitation is fixed without any present purpose of remov-
ing therefrom . . . the place where anything permanently
rests . . . the abode or place where one actually lives."
(34 Cyc. 1647 et seq.) "Home" is defined as "the place of
constant residence; the seat." (Am. Univ. Dict.) Before
the birth of the baby and until the death of decedent the
latter had stopped alternately at the St. Francis, the Little
St. Francis, the Palace, the Little Palace, the Fairmont and
the Majestic hotels, and he had a room at the Fairmont at
the time of his death. All of this was shown in part by the

accounts of those hotels and by their employees. With respect to this evidence it is claimed by respondent that decedent kept a room as an office where the business of the Baird Estate was conducted. The testimony of a number of witnesses is to the effect that when they addressed a letter to him it was to the hotels or to 1611 Vallejo Street and that his letters to them were sent from those addresses. There is no evidence that any communication was ever sent to him at the abodes. A part of the time he stopped at those hotels his mother was living there with him; also his sister, and at times, his half-brothers. Miss Valencia testified he sometimes told her he was going to dine with his mother at the hotel. His tailor testified he sent his clothes, after the fire, to the Hotel Majestic, where he lived for a while with his mother; his address was changed thereafter to 2513 Pacific Avenue; then to 1611 Vallejo Street, and later to the St. Francis Hotel. Three deliveries were made to the Fairmont in 1908; the last on August 11th.

The city directories for the years 1907 and 1908 were introduced in evidence and contained these entries—1907, ''Baird, David J. Residence. 1611 Vallejo Street,'' and 1908, ''Baird, David. Residence. Fairmont Hotel.'' The record of the postoffice from October, 1906, to July 30, 1907, gave his true name and showed his address was changed from 2513 Pacific Avenue to 827 Eddy Street (the office of the family attorney after the disaster), and from 1611 Vallejo Street to the St. Francis Hotel. The addresses he left in the office of the attorney for 1907 and 1908 were the St. Francis and Fairmont hotels. Changes of address were also given to the bank at which he kept his account, and where for a time Benjamin H. Baird was employed, from 2513 Pacific Avenue to 827 Eddy Street, and after the fire, from the St. Francis Hotel to the Fairmont Hotel. Executor Brown testified that when he met decedent in 1907 and asked him where he was living, he answered ''the Fairmont Hotel.'' He was living with Benjamin H. Baird in Mrs. Hutchins' house at 1611 Vallejo Street when the baby was born and at that very time and for several months thereafter his mother was in San Francisco. Mrs. Hutchins was a friend of the Baird family. She testified that while decedent was stopping there he would sometimes be away for several days at a time and on such occasions would explain he had been in the

country. Similar testimony was given by the night watch-man at the Fairmont Hotel. This witness testified that dece-dent would on occasions come in late at night in such a condition of inebriation that he would have to watch him. It was also testified that up to January, 1903, which was about a year after the relationship was formed, decedent kept seasonable hours at 2513 Pacific Avenue, where he lived with his sister, but his habit thereafter was to remain out late, and on this account he was requested by her to leave.

Respondent's witnesses are divided on the question as to when decedent first appeared at the St. Helen Apartments. The betting commissioner testified that because of decedent's intoxicated condition he did not know for several days after Miss Valencia left 1310 Divisadero Street that she had gone to the St. Helen Apartments. Her version is that decedent went with her to look at the place before it was engaged—which is opposed to other testimony for respondent—and that he appeared on the night of the second day following the event. The attending nurse testified she did not see decedent for two or three days after the child was born.

It would appear from the evidence that the life of reck-less dissipation which decedent led contributed to his tragic and untimely end. He had several spells of sickness and was very ill from hemorrhages of the stomach during the months of August and September, 1907. Evidence of his dissipation abounds in the record. It shows such instances as his rushing excitedly into a shoe store and telling a clerk who was a stranger to him but a friend of Miss Valencia, that he was the father of a son and inviting him out to the house; making similar declarations to persons he met on the street, to a policeman in the neighborhood, to chauffeurs, to bartenders, to servants and to strangers in the abodes, and to some of the characters already described. According to such persons he proposed to send the child to Paris to be educated, was going to make him president of the Baird Estate; that he was on his way home to his wife and baby; that he was in a café the night after the child was born—"let everybody know he was the father of a baby," and made other declarations of similar import. It is only upon the theory of the immoral relationship and incidental habits of intoxication that he kept knowledge of the double life he led from his relatives and friends. A striking circum-

stance in connection with his dual existence is that his relatives elected him president of the Baird corporation. In business matters he was bright and attentive.

(c) What has been said on the issues of public acknowledgment and receipt into family applies largely to the remaining issue—whether decedent otherwise treated respondent as a legitimate child. "The criterion referred to in the statute is the treatment usually accorded to legitimate children." (*Estate of Heaton,* 139 Cal. xix [73 Pac. 186].) What was said in the *Estate of De Laveaga,* 142 Cal. 158, 167 [75 Pac. 790, 794], applies here: "But it seems, however, that the relations of affection between Jose Maria and his parents did not cease, as the numerous letters produced at the trial written by him would show, and they also show that in none of them was any reference made to the respondent in this case. In fact, it seems to have been his studied purpose not to refer to or introduce the subject of his illegitimate child in his intercourse or correspondence with his parents."

It is established in the case that respondent was never taken to visit the Baird family, nor, except to Miles T. Baird, was he ever referred to by decedent as his child in his intercourse with the members of his family, that there was no form of communication or association between the child and decedent's relatives, and that decedent never brought the child to any of the places he held out to the community as his residence. While decedent is shown in pictures with Miss Valencia, he never appeared in one with the child. He sent a number of communications to Miss Valencia while he was in Europe in 1905, but no communication was produced as having been sent to her by him after the birth of respondent. Decedent had nearly two years to consider whether he would make financial provision for the child, but that natural duty of a father who contemplated adopting his illegitimate offspring, was, we have seen, with apparent deliberation left undischarged. The record is singularly wanting in any evidence to sustain the reiterated contentions of counsel that decedent intended to adopt the unfortunate child. On the contrary, it seems to have been his clear purpose not to assume any legal responsibility for him. The declarations of decedent contain nothing more tangible than such expressions as that he was going

to make the child president of the Baird Estate, or that he would send him abroad to be educated. Is this the attitude of the father of a legitimate child, or of the father of an illegitimate child intending to adopt it? We have shown there was no estrangement between decedent and his kin and that no reason appears other than decedent's concern for the Baird family why he should keep the child away from them. Such treatment is contrary to the sense in which section 230 of the Civil Code uses the phrase "otherwise treating it as if it were a legitimate child." The treating it as if it were legitimate is as essential to a legal adoption under that section as any of the other elements therein contained.

It may finally be declared that the evidence as to public acknowledgment of paternity, receipt into family, and otherwise treating the child as legitimate, does not, in any true sense, conform to the conception of adoption under section 230. The father of a legitimate child would not allow it to live in a clandestine family or to be known by an assumed name, or to be the object of concealment and dissimulation. The father of an illegitimate child would not hold himself out to the world as having a residence into which he did not receive it. He would especially provide for the future of the child. Decedent's will, already referred to, was dated July 30, 1903. He gave half of his property to his mother and the other half to his half-brothers. In 1907 executor Brown called his attention to the will, but he made no change therein. This item of proof is relevant to the question whether decedent was estranged from his mother and his half-brothers.

Decedent allowed the child to remain in the custody of his mother, where the law placed him (sec. 200, Civ. Code). He could have legitimated the child by marrying the mother (sec. 215, Civ. Code), or he could have made him his heir by a writing under section 1387 of the Civil Code, but he did none of these things nor anything else to indicate he was concerned with the future of the child. His entire course of conduct toward respondent precludes the idea that he intended to do more than support him, and his attitude is consistent with his denial of paternity, and inconsistent with the claim that he intended to treat respondent as the father

193 Cal.—19

of a legitimate child would do. With the exception of Miles T. Baird, no one connected with his life away from the abodes visited him or the child, or acted in the way relatives and friends usually act in such circumstances. **[26]** Giving the evidence its fullest import in favor of respondent there can be no dissent from the conclusion that the failure to publicly acknowledge his paternity, the clandestine nature of the "family," and the isolation of respondent from decedent's relatives and friends, represented a deliberate purpose on the part of decedent to keep them in ignorance of the child, and under the circumstances shown this alone is sufficient to defeat an adoption.

This court declined in *In re Jessup,* 81 Cal. 408, 434 [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742, 22 Pac. 1028], to adhere to the view expressed in the first opinion written by Works, J., and concurred in by three justices, that in cases of adoption under section 230 the only strictness required should be proof of paternity; and that the paternity being satisfactorily established by plenary proof courts should lean strongly in favor of a finding that the father had performed his duty and adopted the illegitimate child. It has been the rule ever since that the elements of paternity, public acknowledgment thereof, receipt of the child into the family of the father as his own, and otherwise treating him as legitimate, must each be established by a preponderance of the evidence, and that if the proof fails in respect to any one of them there is no adoption. "There can be no compliance with section 230 in the absence of the conditions contemplated by that section and absolutely necessary to give it effect." (*Garner* v. *Judd,* 6 Cal. Unrep. 675 [64 Pac. 1076].)

We hold that apart from the doctrine of the law of the case the evidence received on the last trial is insufficient to sustain the special verdicts, or to support the findings, and that a case of adoption has not been established. We further hold that the court erred in denying the motion for nonsuit, in denying the motion for an instructed verdict, and in failing to enter judgment for appellants. This conclusion renders it unnecessary to consider the assignments of error in the rulings and the assignments of misconduct by the court.

The decree of partial distribution is reversed, and the trial court is ordered and directed to set aside the special

verdicts and findings and to enter judgment for appellants, denying the petition for partial distribution upon the ground that respondent is not the adopted son or heir of the deceased.

Wilbur, C. J., Lennon, J., Waste, J., and Myers, J., concurred.

Rehearing denied.